UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6061-CR-FERGUSON

UNITED STATES OF AMERICA               **ORIGINAL**

     Plaintiff

vs.

DARRYL SMITH

     Defendant
_____/

FILED by _____ D.C.
CT. REF.

JUL 2 1 2000

CLARENCE MADDOX
CLERK U S DIST CT.
S D. OF FLA. MIAMI

Ft Lauderdale, Florida
July 3, 2000
10:23 a.m. o'clock

APPEARANCES:

     Edward R. Ryan, Esquire
     Appearing on behalf of Plaintiff

     Joseph Gibson, Esquire
     Appearing on behalf of the Defendant

     REPORTED BY:   Donna Mitchell,  Official
                      Reporting Service

- - - - - -

DEPOSITION

OF

BERTIS THOMPSON

```
 1                          I N D E X

 2                                                    PAGE

 3    WITNESS:                DIRECT   CROSS   REDIRECT

 4    Bertis Thompson            4       57      102

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   THEREUPON, the following proceedings were had:
 2            VIDEOGRAPHER:  This is a video taped
 3   deposition taken at approximately 10:23 a.m., case
 4   style USA versus Darryl Smith, Case No.
 5   00-6061-CR-FERGUSON.
 6            Counsel, please announce your appearances
 7   for the record.
 8            MR. RYAN:  On behalf of the United States
 9   Edward Ryan, Assistant United States Attorney.
10            MR. GIBSON:  For the Defendant Joseph W.
11   Gibson, Jr.
12            THE REPORTER:  Donna Mitchell, Court
13   Reporter, Official Reporting Service.
14            VIDEOGRAPHER:  Video One Productions.
15                    -  -  -  -  -
16   THEREUPON,
17                    BERTIS THOMPSON,
18   a witness of lawful age, having been first duly sworn
19   testified on his oath as follows:
20            MR. RYAN:  Before we go any further, let me
21   just announce for purposes of the record that defense
22   counsel is present.  However, the Defendant, Darryl
23   Smith, is not present.  Counsel has informed me that
24   Mr. Smith is waiving his appearance for the purpose
25   of this deposition; is that correct, Mr. Gibson?
```

```
 1                    MR. GIBSON:  Yes, that is correct.

 2                    MR. RYAN:  And I will proceed at this time.

 3                         DIRECT EXAMINATION

 4    BY MR. RYAN:

 5    Q.   Sir, give us your full name, please.

 6    A.   My name is Bertis Terrevus Thompson.

 7    Q.   Go ahead and spell your middle name for the

 8    record.

 9    A.   T-E-R-R-E-V-U-S.

10    Q.   And Thompson is what?

11    A.   T-H-O-M-P-S-O-N.

12    Q.   And you're here for purposes of a video tape

13    deposition.  You understand you are now under oath;

14    am I correct?

15    A.   Yes, sir.

16    Q.   Have you ever taken an oath when you've

17    testified before?

18    A.   Yes, sir.

19    Q.   Let me first ask, sir, you what is your

20    nationality?

21    A.   Bahamian citizen.

22    Q.   And how long did you live there?

23    A.   Approximately all of my life.

24    Q.   Did you ever live on a continuous basis in the

25    United States?
```

```
 1   A.   No, sir.
 2   Q.   Did you visit on occasion?
 3   A.   Yes, sir.
 4   Q.   And would you stay for periods of time?
 5   A.   Yes, sir.
 6   Q.   When you lived in the Bahamas -- first of all,
 7   how old are you, sir?
 8   A.   I'm 34 years old.
 9   Q.   And what occupations did you have while in the
10   Bahamas?
11   A.   Police officer.
12   Q.   You were a police officer?
13   A.   Yes, sir.
14   Q.   From when?  From when until when?
15   A.   From December 10, 1984 to May of 1998.
16   Q.   And what happened in 1998 -- I'm sorry, when did
17   you resign?
18   A.   May of 1998.
19   Q.   What happened in May of 1998?
20   A.   I decided to quit the force and take a step in
21   another direction as the alien smuggling.
22   Q.   Before we get to that let me just back up a
23   second here.  Do you have a family in the Bahamas?
24   A.   Yes, sir.
25   Q.   Who and what is your family?
```

```
 1   A.   I have a wife and five kids.
 2   Q.   Let me now as we sit here and you are handcuffed
 3   as the agent pointed out.  Are you currently in
 4   custody of the United States Authorities?
 5   A.   Yes, sir.
 6   Q.   At some point recently were you serving a
 7   sentence with the United States Bureau of Prisons?
 8   A.   Yes, sir.
 9   Q.   How long was that sentence?
10   A.   I did 18 months on a 21 month sentence.
11   Q.   And when did you finish that sentence with the
12   Bureau of Prisons?
13   A.   Junet9h of 2000.
14   Q.   After you finished your sentence with the Bureau
15   of Prisons what was to happen?
16   A.   I was to be deported back to the Bahamas.
17   Q.   And upon being released from the Bureau of
18   Prisons who took custody of you?
19   A.   U.S. Immigration.
20   Q.   Were you in fact deported right away as you were
21   told?
22   A.   No, I was not deported right away.
23   Q.   You're here now in the Southern District of
24   Florida, correct?
25   A.   Yes, sir.
```

```
 1   Q.    Tell us your understanding of why you're still
 2   here in the United States.
 3   A.    To my Understanding I'm here as a result of
 4   being a Federal witness in a Federal case.
 5   Q.    What is your understanding what will happen at
 6   the conclusion of your testimony here by deposition?
 7   A.    On conclusion of my testimony I will be handed
 8   back to immigration and be deported back to the
 9   Bahamas.
10   Q.    Let me touch base with you now.  You said you
11   served a sentence with the Bureau of Prisons?
12   A.    Yes, sir.
13   Q.    At some point were you arrested that led to your
14   being incarcerated?
15   A.    Yes, sir.
16   Q.    Tell us when that occurred.
17   A.    I was arrested on December 1st of 1998.
18   Q.    Where did that occur?
19   A.    Fort Lauderdale.
20   Q.    Fort Lauderdale, Florida.
21   A.    Fort Lauderdale harbor, Port Everglades.
22         MR. GIBSON:  Can we go off the record for a
23   second.
24              (Thereupon, there was a discussion off
25              the record after which the following
```

```
 1                    proceedings were had:)
 2   BY MR. RYAN:
 3   Q.   Back on the record.  Mr. Thompson you said you
 4   were arrested in December of back 998; am I correct?
 5   A.   Yes,sir.
 6   Q.   And you said you were arrested in Fort
 7   Lauderdale?
 8   A.   Yes.
 9   Q.   What were you arrested for?
10   A.   The alien smuggling in the United States and
11   into the United States.
12   Q.   Why don't you give us a run down and a synopsis
13   if you will of what was your offense.  I'm sorry,
14   strike that.
15        Were you guilty of what they arrested you for?
16   A.   Yes, sir.
17   Q.   Did you plead guilty or go to trial?
18   A.   I plead guilty.
19   Q.   Did you plead guilty with any sort of agreement
20   to cooperate with the government?
21   A.   No, sir.
22   Q.   Did you at some point cooperate with the
23   government?
24   A.   Yes, sir.
25   Q.   How soon after your arrest did you begin
```

```
 1   cooperating with the government?
 2   A.    At my first initial interview with the
 3   government I cooperated almost right away.
 4   Q.    Would it be the same day or within a few days?
 5   If you know, if you can remember.
 6   A.    I would say shortly after a week in Dallas.
 7   Q.    In Dallas?
 8   A.    Yes, sir.
 9   Q.    You said were you arrested in Fort Lauderdale.
10   Were you transported to Dallas at some point?
11   A.    Yes, I was transported a week later.
12   Q.    The case that you were arrested for, did it
13   originate in Dallas, Texas?
14   A.    Yes, sir.
15   Q.    Is that where you pled guilty?
16   A.    Yes, sir.
17   Q.    Is that where the judge is that sentenced you?
18   A.    Yes, sir.
19   Q.    And you said you cooperated with the United
20   States.
21   A.    Yes, sir.
22   Q.    As a result of your cooperation with the United
23   States did you receive any sort of a benefit in your
24   sentence?
25   A.    Yes, sir.
```

1    Q.    What was that?

2    A.    The government said, in actual fact the judge,

3    from the prosecutor said I got a four point

4    deduction.

5    Q.    I thought you said the prosecutor.  Did the

6    prosecutor file a motion on your behalf?

7    A.    Yes, he filed a motion on a downward departure.

8    Q.    What that to reduce your sentence?4?

9    A.    Yes, sir.

10    Q.    What was your original sentence?

11    A.    My original guidelines was 31 to 43 months and

12    the four point reduction brought it down to 21 to 27

13    months and the judge gave me the low end of the

14    guidelines.

15    Q.    So you saved yourself in prison over a year?

16    A.    About a year.

17    Q.    And of that 21 months you said you served 18; is

18    that correct?

19    A.    Yes, sir.

20    Q.    And what is it that allows you to serve 18

21    months on a 21 month sentence?

22    A.    You get the three months off with good behavior.

23    If you have no problems in prison doing your time,

24    doing time, no problems, you're entitled to the good

25    time which was in my case three months.

```
 1   Q.   And the prosecutor who asked the judge to reduce
 2   your sentence, is he also in Dallas, Texas?
 3   A.   Yes, sir.
 4   Q.   And what was his name if you remember?
 5   A.   His name was Yarway.
 6   Q.   Can you spell that for us?
 7   A.   Y-A-R-W-O-U-G-H -- I can't remember exactly.
 8   Q.   That's all right.  Did you cooperate with that
 9   prosecutor in Texas?
10   A.   Yes, I did.
11   Q.   Did you testify for him in a case out there?
12   A.   I testified but not in Dallas.  I testified in
13   Miami.
14   Q.   In Miami.  And which case was that?
15   A.   This was a case involved in the alien smuggling
16   against one.
17   Q.   Against another person?
18   A.   Yeah, it was against another individual that
19   worked with me at one point.
20   Q.   And did you testify anywhere else in the
21   country?
22   A.   I testified before a Grand Jury.
23   Q.   And where was that?
24   A.   Miami.
25   Q.   And who was the prosecutor there?
```

```
 1   A.    I cannot remember his name.
 2   Q.    And just so we're clear, those things that you
 3   talked about testifying in Miami, did that have
 4   anything to do with the case of -- strike that.
 5        The Defendant, Darryl Smith, the defendant in
 6   this case was not a defendant in that case; am I
 7   correct?
 8   A.    No, sir.
 9   Q.    I am correct?
10   A.    Yes, sir, you are correct.
11   Q.    Now if you would, sir, tell us about your
12   offense, what were you doing?
13   A.    I was initially arrested for smuggling of
14   illegal aliens into the United States and smuggling
15   illegal aliens within the United States.
16   Q.    Tell us about your operation, what did you do?
17   When did you start doing this?
18   A.    I started In November of 1997.  I been a part of
19   the operation.  My job mainly was find boat captains,
20   pay Bahamian immigration officials, and collect money
21   and funds from within the United States and back to
22   the Bahamas.
23   Q.    Did you work for other people as well or were
24   you the boss of your own part of this operation?
25   A.    I was a supervisor in the operation that was
```

```
 1   headed by two other individuals.
 2   Q.   Now, the persons that you smuggled you described
 3   them as illegal aliens.
 4   A.   Yeah.  Mainly Indians from India and Ecuadorians
 5   from Ecuador.
 6   Q.   Anywhere else that you can think of?
 7   A.   No, sir.
 8   Q.   And how did these people come to be with you?
 9   A.   Okay.  Once they're put on the flight in India
10   by what we call an agent, they're put on the flight.
11   They come into Moscow and the transit would be at the
12   airport.  From Moscow they'll even come into Cuba,
13   Havana, Cuba, and spend two or three days until the
14   next available flight.
15       From there they will be -- they're coming to the
16   Bahamas.  Waiting on them would be immigration
17   officials that have been previously paid that allowed
18   them into the country.
19             MR. RYAN:  Let me stop you there.  Mr.
20   Videographer and Ms. Court Reporter, I'd like to move
21   behind you if I can.  Will the sound work?  Can you
22   hear okay?
23             VIDEOGRAPHER:  Yes.
24   BY MR. RYAN:
25   Q.   Go ahead, Mr. Thompson, continue please.
```

```
 1   A.    On the Indians arrival or the Ecuadorians arrive
 2   into the country --
 3   Q.    How would they get to your country, the Bahamas?
 4   A.    By commercial flight.
 5   Q.    Who arranged all that, was it you or someone
 6   else?
 7   A.    The flights was arranged from Cuba to the
 8   Bahamas, sometimes by myself and sometimes by a
 9   leader of the organization, which was Nick Diaz.  He
10   originated, arranged the flights from India and I
11   took most of them out of Cuba into the Bahamas.
12   Q.    Now this person Diaz, you say he's the head of
13   the organization?
14   A.    Yeah.
15   Q.    Where is he now?
16   A.    He's doing time.
17   Q.    Did you testify about him?
18   A.    I cooperated with the government and gave them
19   information about him, yes.
20   Q.    Did he go to trial or did he plead guilty, if
21   you know?
22   A.    He plead guilty.
23   Q.    Now back up one more step for me.  How would
24   these persons get from either India or Ecuador to
25   Cuba?
```

```
 1   A.    Commercial flights.

 2   Q.    And who arranged that, was it you or somebody

 3   else?

 4   A.    Oh.  Nick Diaz would arrange the commercial

 5   flight out of India into Russia or Russia into Cuba.

 6   And I would mostly take it from Cuba into the

 7   Bahamas.

 8   Q.    And if you could just turn your chair a little

 9   bit so you're facing forward.  Thank you.

10         Now this occurred -- this began you said when?

11   A.    This began in November of 1997.

12   Q.    Once they were in the Bahamas what would you do

13   with them?

14   A.    Once they arrive in the Bahamas I would then at

15   this time find boat captains, come aboard the boats

16   and send them into the U.S.  Mainly West Palm

17   Beach-Fort Lauderdale area.  On a few occasions

18   Miami.

19   Q.    Once they were in the United States what would

20   you do with them?

21   A.    Once they came in the United States I would have

22   already what is called a stash house.  The Indians

23   would be put in the stash house until payment has

24   been met by the families all over United States.

25   Mainly New Jersey, New York, Cincinnati, Pittsburgh,
```

```
 1   Atlanta, California.
 2        Family members that had arranged through our
 3   agent in India to allow us to bring the Indians into
 4   the United States.  So while the Indians are in the
 5   stash house, the families will arrange payment.  On
 6   receiving that payment, the Indians would then be
 7   released.
 8        Either we would put them on bushes or airplanes
 9   to their final destination, wherever it may be.
10   Q.   Were you involved at that point?
11   A.   Yes, sir.
12   Q.   How would you go, would you be in the United
13   States?
14   A.   Yes, sir.
15   Q.   How did that work?
16   A.   Well, I would be here supervising the stash
17   house along with other individuals.  I would allow
18   the Indians to make a phone call, call their
19   families, assuring the families that they're here in
20   the United States.  Once the family are sure that
21   they're here in the United States, they would then
22   tell me where they would make payment.
23        We basically had houses in Atlanta, houses in
24   New Jersey, so if you have a family member in New
25   York you would send the, money to the nearest place
```

 1   which would probably be New Jersey.  Once my man

 2   called me in New Jersey and tell me he receive

 3   payment, the family member would then tell me how to

 4   send that individual.

 5       I would then purchase an airline ticket or bus

 6   ticket, put the deadline on it, communicate back with

 7   the family to give the flight number and time of

 8   arrival of flight or bus number.

 9   Q.   Now you told us before that you would get boat

10   captains to do the transportation from Bahamas to the

11   U.S.

12   A.   Yes, sir.

13   Q.   When you say boat captains are we talking about

14   row boats, big freighters; what are we talking about?

15   A.   Well, basically anybody that has a boat that is

16   feasible for the journey across the ocean.

17   Q.   Did you use different persons in that role?

18   A.   Yes, sir.

19   Q.   Many different or just one or two?

20   A.   You talking about boat captains?

21   Q.   Yes, throughout the course of the entire time.

22   A.   Yeah, I used several boat captains.

23   Q.   I'd like to now turn your attention to 1998.  In

24   1998 did you come in contact with an individual at

25   any point by the name of Shawn Harris?

```
 1   A.   Yes, I did.
 2            MR. GIBSON:   What is the date?
 3            MR. RYAN:   I said 1998 but I will narrow it
 4   down.
 5            THE WITNESS:   Shawn Harris.
 6   BY MR. RYAN:
 7   Q.   You've identified these photographs as being
 8   Shawn Harris; am I correct?
 9   A.   Yes, sir.
10            MR. RYAN:   Let me just put it in front of
11   the camera if I can.
12   BY MR. RYAN:
13   Q.   Now, Mr. Thompson, when did you come in contact
14   with this person Shawn Harris?
15   A.   I believe I came in contact with Shawn Harris
16   sometime in April of 1998 at the Xanadu (phonetic)
17   Hotel, Freeport, Bahamas.
18   Q.   Tell me how you came in contact with him.   Are
19   we talking about this is the first time you met him;
20   is that correct?
21   A.   Yes, sir.   This is the first time.
22   Q.   And physically?
23   A.   Physically, yes, sir.
24   Q.   Did you know if you had been working with him
25   somehow prior to actually meeting with him in person?
```

```
 1   A.    Yes, sir.   I had information that I was working
 2   with him.
 3   Q.    Tell me about that.
 4   A.    At first I had what is called a go-between man.
 5   Q.    And who is this go-between man?
 6   A.    Skipper.   I went as Randy Woods.
 7   Q.    What was Skipper's job?
 8   A.    I would give the Indians to Skipper, skipper who
 9   would then tell me that he has somebody to carry
10   these aliens.   So I would deliver the aliens to a guy
11   named Shawn Brewery.
12   Q.    Could you spell Brewery for us, please.
13   A.    I think the correct spelling is B-R-E-W-E-R-Y.
14   Shawn Brewery would then take the aliens which would
15   be approximately about 11 aliens the majority of the
16   time.   He would take those aliens in the go fires
17   (phonetic) boat out so far and deliver them onto
18   bigger vessel, that vessel which I learned later to
19   be the vessel of Darryl Smith.
20   Q.    Stopping here at some point or stopping right
21   there.   At some point did you learn the persons who
22   were doing the transporting who were meeting up with
23   this Shawn Brewery person?
24   A.    Yes, sir.
25   Q.    How did you come to find out who they were and
```

1    meet up with them?

2    A.    Through my uncle.

3    Q.    Who was that?

4    A.    Skipper.

5    Q.    Tell us about that?

6    A.    Okay.  Randy Woods, he told me about Shawn

7    Brewery and told me about Shawn Brewery connection

8    that took the aliens out from the ocean into the

9    port.  At that point I did not learn about the name

10    of Shawn Harris.  So what I did on the arrival of

11    Shawn Harris back into United States, Valentino

12    Thompson who would collect the aliens from Shawn

13    Harris, I told him to get the name of that

14    individual.  I wanted to work with them directly and

15    cut out the go between man.

16    Q.    Now let me stop you there.  This Valentino

17    Thompson, I haven't heard this name before.  Did he

18    work for you?

19    A.    Yes, sir.

20    Q.    Was he a relative of yours?

21    A.    Yes, sir.

22    Q.    And as to this Mr. Thompson, you asked him to

23    find out the name of the person doing the

24    transporting?

25    A.    Yes, sir.

```
 1   Q.    And tell us about this cutting out thing, what
 2   do you mean?
 3   A.    Yeah.  I told him to get the name of the
 4   individual, get his phone number and let him know I
 5   wanted to work with him.  Okay, this was done.
 6   Q.    But what was the purpose in that, why did you
 7   want to work with him directly as opposed to working
 8   through someone?
 9   A.    Okay.  Because the go-between man was charging
10   me $3,000 a head, okay?  So I knew that there was
11   something in it for the go-between man.  So what I
12   did, I wanted to cut that out, the $3,000, work
13   directly and pay a smaller fee.  I kept the actual
14   fee for myself.
15   Q.    So you were basically pushing Skipper out of the
16   picture?
17   A.    Pushing Skipper for more money in my pocket,
18   yes.
19   Q.    And did you in fact succeed in making contact
20   with this person?
21   A.    Yes, sir.
22   Q.    Did Valentino Thompson get you the name?
23   A.    Yes, he got the name.  He gave me the phone
24   numbers.  My phone numbers was given to Shawn Harris.
25   Communication was done at one point.  A fee was
```

```
 1   discussed of $2,600.

 2   Q.   $2,600 what?

 3   A.   $2,600 per alien because he told me that he was

 4   getting -- he said that he was getting paid $2,000 an

 5   alien.  So I told him if you work with me and leave

 6   Skipper and Shawn Brewery and all of those guys, I

 7   said I would pay you $2,600 per alien.

 8   Q.   And who were you speaking to?

 9   A.   Who was I speaking to?

10   Q.   Yes.

11   A.   I was speaking to Shawn Harris.

12   Q.   How do you know it was him, was it by telephone

13   or in person?

14   A.   No.  We spoke on the phone and we arranged to

15   meet.  So when he came in -- do you want me to go on?

16   Q.   Yes, please.

17   A.   Okay.  When he came in I met him at the Xanadu

18   Beach Hotel and we sat down and we discussed a price

19   and what we will do.  And he was willing to work with

20   me.

21   Q.   And is that when you discussed price per alien

22   and all that?

23   A.   Yes, sir.

24   Q.   And do you know approximately when this would

25   have occurred?
```

```
 1   A.   This meeting?

 2   Q.   Yes.

 3   A.   This meeting would occur sometime in April of

 4   '98.  Sometime around there, I can't be exact.

 5   Q.   Now, let's move on from there.  In your

 6   conversation with Mr. Harris --

 7   A.   Yes, sir.

 8   Q.   By the way, had you seen a boat up until this

 9   point?

10   A.   I saw a boat.  It was at night and I saw a boat

11   the following morning, the following day.

12   Q.   So let's stay on the hotel meeting for the

13   moment.  During the course of this hotel meeting Did

14   Mr. Harris in talking with you talk about other

15   individuals with whom he was working?

16   A.   Yes, sir.

17   Q.   What did he say?

18   A.   He told me that he was working in conjunction

19   with his brother, Darryl Smith, who he referred to as

20   D.

21   Q.   Did you meet this person at this point?

22   A.   D?

23   Q.   At this point.

24   A.   No, sir.

25   Q.   Did he tell you anything else about D?
```

```
 1   A.    No, sir, not at that point.
 2   Q.    Now you said that -- well, first of all, as to
 3   that meeting in that hotel room right then, was the
 4   extent of it or did you talk about anything else that
 5   you can recall?
 6   A.    We just basically talked about putting some
 7   aliens on the vessel the following day.
 8   Q.    Were there aliens in the Bahamas under your
 9   control at this point?
10   A.    Yes, sir, there was.
11   Q.    And the next day did something happen?
12   A.    Yes, sir.
13   Q.    Tell us what happened.
14   A.    Okay.  I went out, I saw the boat, the boat was
15   parked at the marina at the dock.
16   Q.    Describe this vessel for us.
17   A.    It was about a 35 footer yacht about -- it was
18   black and white in color.  It has a plastic valance
19   to the top, to the very top of it that covers it.
20   That's basically what I can remember of the vessel.
21   Q.    In the time after that day did you see vessel
22   again?
23   A.    Yes, sir.  I saw it at night.
24   Q.    And did you see it on more than one other
25   occasion?
```

```
 1   A.    Yes, sir.

 2   Q.    How many times total do you think you saw this

 3   vessel?

 4   A.    Totally I saw it about one, two, three -- I'd

 5   say approximately four times to be exact.

 6   Q.    Let me stop you now for a moment and show you a

 7   couple of photographs.  It's currently marked as

 8   Government's Exhibit No. 8, which I am showing to

 9   defense counsel, and another one marked as

10   Government's Exhibit No. 12.

11         First I will show you No. 8 and ask you if you

12   recognize this?

13   A.    Yes, sir.  It resembles the boat that I saw.

14   Q.    And let me show you No. 12 and ask you if you

15   recognize that?

16   A.    Yes, it also resembles the boat I saw.

17              MR. RYAN:  Let me hold them up to the

18   camera.  This first one would be No. 8.  Now let me

19   hold up No. 12.

20   BY MR. RYAN:

21   Q.    Mr. Thompson, when you say that the photographs

22   that I just showed you resembled the boat you saw,

23   was there any anything different about the boat as

24   you saw it then and then as it appears in those

25   photographs?
```

```
 1   A.    No, sir.
 2   Q.    So that next day you said you saw the boat and I
 3   think you said it was at the marina; am I correct?
 4   A.    Yes, it was at the same marina at the hotel.
 5   Q.    At the Xanadu?
 6   A.    Yes, sir.
 7   Q.    Continue if you would.  What happened next?
 8   A.    I came at the hotel, I spoke with Shawn again.
 9   And this time I saw another individual.
10   Q.    Besides Mr. Harris?
11   A.    Yes, sir, another individual with him.
12   Q.    With Mr. Harris?
13   A.    Yes, sir.  He was a male African American.
14   About six foot, 205 pounds, with gold teeth in his
15   mouth.
16   Q.    Did you ever learn his name?
17   A.    No, sir.  I might have heard it then but I can't
18   recall it now.
19   Q.    What was his role?
20   A.    At that point I didn't know what his role was.
21   He just was there to assist Shawn at that point.
22   Q.    All right, continue.  What happened next?
23   A.    That night I told Shawn that I had some aliens
24   coming in from Nassau and I wanted his boat to go out
25   and meet the aliens in the ocean, like 10 miles off.
```

1   And I wanted him to put these aliens, transfer from

2   one boat onto the other boat.  He agreed.  This was

3   done and that's what we did.  The aliens was

4   transported from one boat onto the next and Shawn

5   took them back into the marina.

6   Q.   How do you know that the transfer occurred, were

7   you out there?

8   A.   I was there.  I was there doing the transfer.

9   Q.   Tell us about the transfer.

10  A.   I left on Shawn's boat.  The boat --

11  Q.   Let me stop you, sir.  About what time of day

12  did this occur?

13  A.   This was in the night.

14  Q.   What time approximately?

15  A.   Approximately about I'd sometime around 11

16  o'clock.

17  Q.   Why did you do it at night?

18  A.   It was much safer.  There's nobody out there

19  that I could see.

20  Q.   All right.  Continue, sir.

21  A.   Me, Shawn and this other individual that came

22  with Shawn, we went out -- I think we went about 10

23  miles out.

24  Q.   Were you in the boat with Mr. Harris?

25  A.   Yes, sir.

```
 1   Q.    And is it that same vessel you told us about?
 2   A.    Yes, sir, I was in the boat.  We went out there.
 3   He was communicating by cellular phones to the other
 4   vessel at this time to get to find exactly where they
 5   were.
 6         Okay.  They said that they saw us so we asked
 7   them to flash a light.  They in return flashed a
 8   light, we in return flashed a light back.  They came
 9   in side by side, we tied the boats onto one another
10   and transported the aliens from one vessel to the
11   next.
12         After this was completed we went back into the
13   marina, tied the boat.  I left and I came back the
14   next day and Shawn and this young man left about 12
15   midday to come into Fort Lauderdale.
16   Q.    All right.  The aliens that you're talking about
17   right now, how many first of all, approximately?
18   A.    There was approximately -- on that trip I think
19   approximately 30 aliens.
20   Q.    And where were they from if you know?
21   A.    They was Indians.
22   Q.    From India?
23   A.    Yes, sir.
24   Q.    And did any of these persons have any sort of
25   formal proper documents for entering the United
```

```
 1   States?
 2            MR. GIBSON:  Objection, foundation.
 3            MR. RYAN:  Let's see if I can clear it up.
 4   BY MR. RYAN:
 5   Q.   Sir, did any of these persons have, to the best
 6   of your knowledge -- strike that.  Leave that go.
 7   Did you deal with them personally, did you see them
 8   up close?
 9   A.   Yes, sir.  I dealt with them personally.
10   Q.   Did you talk to them at all?
11   A.   Yes, sir.
12   Q.   To the best of your knowledge did any of them
13   have any sort of appropriate or proper documents for
14   entering the United States through immigration
15   channels?
16            MR. GIBSON:  Same objection.
17   BY MR. RYAN:
18   Q.   You can answer.
19   A.   No, sir.
20   Q.   How do you know?
21   A.   Because I checked the passport.  I collect all
22   passport.  They don't leave the country with their
23   passport just in case they was stopped at sea and the
24   Bahamian stamp that is in the passport, U.S.
25   Immigration would not know the name of that Bahamian
```

1   Immigration Officer that allowed them into the

2   country, because it has a stamp with that officer's

3   number on it.  So I collect all passports before

4   sending the individuals to the United States.

5   Q.   Did you as the organizer of the trip take any

6   steps to bring them through the immigration services

7   of the United States when they arrived in the United

8   States?

9   A.   No, sir.

10  Q.   Were you in fact trying to avoid immigration?

11  A.   Yes, sir.

12  Q.   All right.  You said there approximately 30 and

13  from India.  You said at some point it was

14  successful; how do you know that?

15  A.   Pardon me, what do you mean?

16  Q.   Was this venture successful, did these aliens

17  get brought into the United States?

18  A.   Oh, yes, sir.

19           MR. GIBSON:  Objection, foundation.

20  BY MR. RYAN:

21  Q.   Do you know?

22  A.   If the trip was successful?

23  Q.   Yes, sir.

24  A.   Yes, sir.

25  Q.   How do you know?

```
 1   A.    Because on completion of the operation they was
 2   paid.  And my man on this side, which is Valentino
 3   Thompson, at that time told me that the Indians
 4   arrived safely and he got them and they was paid.
 5   Q.    Did you in fact make payments for the services
 6   of Mr. Harris?
 7   A.    Yes, sir.
 8   Q.    How did you do that?
 9   A.    I made a down payment in Freeport, Bahamas, with
10   a down payment there.  The first trip, the first trip
11   if I could recall -- no, my mistake.  The first trip
12   was paid by myself.  I came in physical contact with
13   Shawn Harris.
14   Q.    Where was that?
15   A.    This was in I think Miami.
16   Q.    Did you first make a payment in the Bahamas?
17   A.    Yes, sir.
18   Q.    What was that?
19   A.    Shawn Harris would only take about 28 aliens so
20   the down payment would be $1,000 per alien down.
21   Q.    Did you make a payment on this first trip that
22   you've been talking about?
23   A.    Yes, sir.
24   Q.    And you made that to who?
25   A.    I made it to Shawn Harris.
```

```
 1   Q.   And it was in the form of what kind of currency?

 2   A.   It was in US currency.

 3   Q.   Dollars?

 4   A.   Yes, sir.

 5   Q.   You're not talking about a check, right?

 6   A.   No dollars.

 7   Q.   And did you take any steps to make the full

 8   payment when it was after the trip?

 9   A.   Yes, sir.

10   Q.   Tell us about that.

11   A.   Well, basically after the boat would leave I

12   would then take steps, catch a flight and go into

13   United States and wait for the arrival of the vessel.

14   Most of the time -- well, at this particular time

15   that I work along with Shawn, these individuals were

16   taken to a warehouse.  They use a U-haul truck from

17   the marina into where they have them housed.

18   Q.   Let me stop you there and ask you this after

19   this first trip, did you make contact with the aliens

20   once they were in the United States?

21   A.   (No response.)

22   Q.   Do you understand my question?

23   A.   No, sir.  No, I didn't make no contact with

24   them.

25   Q.   All right.  Not on this first trip?
```

```
 1   A.   No, sir.
 2   Q.   Did you at some point take steps or make steps
 3   to make your full payment?
 4   A.   Yes, sir.  Can I go back a little bit and
 5   correct myself?
 6   Q.   You can correct yourself right now.
 7   A.   Okay.  I'd like to correct myself.  On the first
 8   trip, I never made that first payment.
 9   Q.   The down payment?
10   A.   Yes, sir -- no, the down payment was made but
11   the balance was not made by myself.
12   Q.   Who was it made by?
13   A.   It was made by Valentino Thompson.
14   Q.   At whose direction?
15   A.   At my direction.
16   Q.   That was for the balance to be -- what was the
17   balance to be?
18   A.   The balance -- he would have gotten $28,000.00
19   down and his balance would have been in the sum of--
20   Q.   For each alien, how much was the total fee for
21   transport?
22   A.   The total fee was $2,600.00 for each.
23   Q.   Was that with the down payment, without the down
24   payment.
25   A.   The down payment was $28,000.00, so he'd get the
```

```
 1  balance of $28,000.00 upon completion of the job.
 2  Q.   My question is, per alien, forget about down
 3  payment, what was the entire fee, including the down
 4  payment?
 5  A.   The total amount that would be paid?  The total
 6  amount that would be paid, if I could recall, would
 7  be approximately $72,800.00.
 8  Q.   Each alien cost you how much to transport?
 9  A.   Each alien cost me $2,600.00.
10  Q.   Is that without a down payment or included?
11  A.   That's included.
12  Q.   That's fine.  As to this first load, do you know
13  where in the United States the arrival of Mr. Harris
14  occurred?
15  A.   No, sir, not the first trip.
16  Q.   Do you know roughly?  Do you know what state it
17  was in?
18  A.   Florida.
19  Q.   Was there a second trip that you did with Mr.
20  Harris?
21  A.   Yes, sir.
22  Q.   Tell us about that one from the start.
23  A.   The second trip he arrived at Freeport Grand
24  Bahama Market Xanadu Marina, as he did on the first
25  trip.
```

```
 1   Q.   And about when did this occur?
 2   A.   This occurred sometime in -- I would estimate
 3   somewhere around June, July.
 4   Q.   Of what year?
 5   A.   Of '98.
 6   Q.   Okay.  Continue.
 7   A.   At this point I met D that night in the hotel
 8   along with his brother.
 9   Q.   This is the first time you ever met D?
10   A.   Yes, sir.
11   Q.   Tell us about it.
12   A.   He was in the hotel.  Shawn introduced us.
13   Q.   Which hotel?
14   A.   Xanadu Beach Hotel.  Shawn introduced us in the
15   hotel room that they was staying in at the time going
16   to visit is his brother.  He told me that the boat --
17   it's his brother's boat, this is his brother.
18   Q.   Did he introduce you by full name?
19   A.   No.  At that time he just introduced himself as
20   D.  He mentioned his name was Darryl, and Shawn was
21   calling him D.  So I just picked it up as D.
22   Q.   Let me stop you there for a moment and show you
23   a photograph and ask you if you recognize that.
24   A.   Yes.  Looks look D.
25   Q.   I'll show it to the camera.
```

```
 1              MR. RYAN:  For the record, Counsel, seen in
 2   this photograph as stipulated was in fact your client
 3   Darryl Smith who has waived his appearance.
 4              MR. GIBSON:  Yes.
 5   BY MR. RYAN:
 6   Q.   Tell me about this meeting.
 7   A.   We met.  We had a discussion.  D started to talk
 8   about trying to buy some marijuana.  He wanted a
 9   connection about how he could get himself some
10   marijuana.  He said that he needed to get his hands
11   on some money first.  At this point, I had no
12   connection for him.  He then in return told me that
13   he mostly get his marijuana out of California and
14   bring it into Florida.
15   Q.   All right.  Continue.
16   A.   That was basically the discussion.  He told me
17   that the guy that was with Shawn was there to
18   represent on his behalf.  The following day, as
19   usual, we picked the aliens up from the ocean, put
20   the aliens, 28 as normal, and the following day,
21   somewhere around noon, D and Shawn, they left and
22   went back into the United States.
23   Q.   Let me stop you just for a moment.  The meeting,
24   the time that you first met D for the first time,
25   what time of day did that occur?
```

1  A.    This happened in the evening sometime around

2  8:00.

3  Q.    During this meeting, did you learn of any family

4  connections between Mr. Harris and D?

5  A.    Yes, sir.

6  Q.    What did you learn?  First of all, who did you

7  hear it from?

8  A.    I heard it from Shawn.

9  Q.    What did he tell you?

10  A.    He told me they were brothers.

11  Q.    You said you went out off the Bahamas and picked

12  up the aliens.

13  A.    Yes, sir.

14  Q.    Who went?

15  A.    Me, Shawn, D.  That was it.

16  Q.    And who, sir -- I'm sorry.  How did you get out

17  into the water?

18  A.    We went on the same boat that we used before,

19  the yacht.

20  Q.    Is it the same vessel that I showed you in

21  photographs?

22  A.    Yes, sir.

23  Q.    How far out did you go approximately.

24  A.    We went about ten miles out.

25  Q.    Where were the aliens?

```
 1   A.   The aliens was in another vessel at the time.
 2   Q.   The other vessel--
 3   A.   Coming in from Nassau.
 4   Q.   Did you have any connections to this other
 5   vessel?
 6   A.   Yes, sir.
 7   Q.   What was the connection?
 8   A.   Basically, it had told me he had my aliens on
 9   it.
10   Q.   Were they part of your operation?
11   A.   Yes, sir.
12   Q.   When the aliens were transferred onto the boat,
13   whose boat was that?  Where did they go?
14   A.   Most of them transferred onto the boat that
15   belonged to Darryl.  The boat then was taken back in
16   the Xanadu Marina.
17   Q.   Where did the aliens go on this boat?
18   A.   They went inside into the cabin.  Most of it was
19   stored in the cabin.  The boat was packed at the
20   marina and remained on board until the following day,
21   which would be like around 12:00 midday when Shawn
22   and D would normally leave.
23   Q.   You said a moment ago that you learned who the
24   boat belonged to.  How did you learn who the boat
25   belonged to?
```

```
 1   A.   I learned it in the hotel room.

 2   Q.   From whom?

 3   A.   From D.

 4   Q.   What did he tell you?

 5   A.   He told me that the boat belonged to him.  Shawn

 6   at the same time told me that the boat belonged to

 7   his brother.  Shawn also mentioned that he was

 8   working for his brother.

 9   Q.   During this meeting in the hotel?

10   A.   Yes, sir.

11   Q.   When the aliens were put on board the vessel

12   that you were on along with Mr. Harris and D, did you

13   give the aliens any sort of instructions about what

14   they were supposed to do?

15   A.   I just told them to stay down, stay quiet, and

16   stay away from the window.

17   Q.   You said the vessel went some place.  Where did

18   it go?

19   A.   Back to the marina, Xanadu Marina.  It was

20   parked in a slot.

21   Q.   What did you do?

22   A.   I left.

23   Q.   You said at some point this vessel left the

24   Bahamas?

25   A.   The following day.
```

```
 1   Q.   How do you know that?

 2   A.   I came over to the marina to make sure it goes

 3   off.  It never leave before I reach.  I come at the

 4   marina, we talk to be paid, and then they would

 5   leave.

 6   Q.   Did you make a payment on this date?

 7   A.   Yes, sir.

 8   Q.   To whom?

 9   A.   To Shawn and D.

10   Q.   Who did you hand the money to?

11   A.   This money is handed to D.

12   Q.   How much did you hand him?

13   A.   $28,000.00.

14   Q.   What happened after that, sir?

15   A.   They left.  They left.

16   Q.   Did you see them go off?

17   A.   Yes, sir, I saw them.

18   Q.   What did you do then?

19   A.   Let them go.

20   Q.   At some point, did you --

21   A.   I made arrangements travelling to the US.  Came

22   into the United States.  I met with Shawn and D later

23   on that day, sometime around -- it was in the night,

24   sometime around 8:00, 9:00 o'clock in the night?

25   Q.   And where were the aliens at this point?
```

1  A.    The aliens was at a warehouse.

2  Q.    Do you know where?  First of all, did you ever

3  see them in the warehouse?

4  A.    (Inaudible.)

5  Q.    Was this the warehouse that you had rented?

6  A.    No, this was the warehouse that I was told by D

7  that he had rented.

8  Q.    Do you know where it is?

9  A.    No, no, no, I take that back.  If I can recall,

10  he didn't say what, he said belonged to somebody.

11  Q.    This warehouse, do you know where it is?

12  A.    No, sir, I can't recall.  It was in the Miami

13  area.

14  Q.    Tell us what happened when you made contact with

15  these people?

16  A.    Normally after they have been paid the balance

17  of the money, I was taken to the warehouse, it was

18  collected and taken to the safe house.

19  Q.    Did that occur in this occasion?

20  A.    Yes, sir.

21  Q.    What was the price per alien on this second

22  trip?  Was it the same as the first trip?

23  A.    The same.

24  Q.    And who would you have made the balance payment

25  to?

```
 1   A.   The balance was made to D.
 2   Q.   Was that by you?
 3   A.   Yes, sir.
 4   Q.   Did you pay him in cash or some other form?
 5   A.   US currency.
 6   Q.   Cash.
 7   A.   Cash.
 8   Q.   As to the aliens, did you take charge of them at
 9   that point?
10   A.   Yes, I did.
11   Q.   Where did you take them to?
12   A.   I took them to a safe house.
13   Q.   Once at the safe house, did you make
14   arrangements with their families?
15   A.   Yes, sir, I did.
16   Q.   Where was this load from?  These people, where
17   were they from?
18   A.   India.
19   Q.   Was there a third trip?
20   A.   Yes, sir, there was.
21   Q.   Tell us about that.  Approximately when was it?
22   A.   The last year was sometime, I think, in the
23   month of October.
24   Q.   1998?
25   A.   Yes, sir, in 1998.
```

```
 1   Q.   Let me just stop you here for just a moment.  At
 2   this point, who are you talking to of these folks
 3   you've identified for us.
 4   A.   Who am I communicating with?
 5   Q.   Yes, when they're not present, who are you
 6   talking to?
 7   A.   I'm talking to Shawn, sometimes talking to D.
 8   Q.   How are you talking to them?
 9   A.   Paging, he call me back or I call him, or I call
10   him and he call me by telephone, cellulars.
11   Q.   To Mr. Harris and this person D you've
12   identified, did they know you by a name other than
13   Bertis Thompson?
14            MR. GIBSON:  Object to the form.
15   BY MR. RYAN:
16   Q.   What name did they call you?  What name did you
17   use in dealing with them?
18   A.   Tommy.
19   Q.   Tommy?
20   A.   Yes, sir.
21   Q.   Tell us about this third trip, please.
22   A.   The third trip, there was no money paid down.
23   There was no down payment.
24   Q.   Who was there?
25   A.   Shawn Harris and D.  Shawn Harris got $4,000.00
```

1  from me, but he got it from me behind D's back.

2  Q.  Why was that?

3  A.  He needed the money, and he didn't want D to

4  know because if D found out, it would have been a

5  problem.  So he told it's best to keep it away from

6  D, which I did.  At this point --

7  Q.  Hold on a second.

8              (Thereupon, there was a discussion off

9              the record after which the following

10             proceedings were had:)

11             MR. RYAN:  Just for the record at this

12  point, I think we might have broken the camera.  Just

13  entering the room at this time is Robert Baruby

14  (phonetic) of the Federal Public Defender's Office

15  who represent -- his office represents the witness

16  Bertis Thompson.  Correct me if I'm wrong, Mr. Baruby

17  or Mr. Thompson, the Federal Public Defender's Office

18  was appointed to represent Mr. Thompson on a material

19  witness complaint; is that correct?

20             MR. BARUBY:  I believe so.

21             MR. RYAN:  And Mr. Thompson, let me just

22  advise you now what Mr. Baruby is asking, just to put

23  it on the record, he is available to speak with you

24  if at any point you wish to speak with him.  Do you

25  need to speak with him for any purpose right now?

```
 1              THE WITNESS:  No, sir.
 2              MR. RYAN:  Do you want him to stay or is it
 3    all right to --
 4              THE WITNESS:  It doesn't matter.
 5              MR. RYAN:  How about if we do this.  I'll
 6    put it on the record that, Mr. Thompson, in the event
 7    you wish to speak to your attorney at any point
 8    whatsoever, just tell us and we will stop the
 9    deposition at that point, and I'll contact
10    Mr. Baruby; is that all right?
11              THE WITNESS:  Yes, sir.
12              MR. RYAN:  Mr. Baruby, is that okay?
13              MR. BARUBY:  That's fine.
14         (Thereupon, Mr. Baruby exits the courtroom.)
15    BY MR. RYAN:
16    Q.   Mr. Thompson, continue please.
17    A.   I was at part where I said that there was no
18    down payment made on this last trip.
19    Q.   Yes, sir.
20    A.   Shawn Harris got $4,000.00 from me but he got it
21    behind D's back.  Same arrangement, same formality,
22    left about the same time, 28 aliens.
23    Q.   Where were these people from?
24    A.   India.
25    Q.   Okay.
```

```
 1   A.    They came in.  At this time when the aliens

 2   arrive in the United States, I was not available.  I

 3   told them that I was going up to Pittsburgh,

 4   Pennsylvania, because I didn't have the money on hand

 5   at the time.  The people that I worked for wanted me

 6   to go to Pennsylvania to pick up some money.  So I

 7   told them on my way back down, I would pay them their

 8   money.

 9   Q.    You told this to whom?

10   A.    To Shawn and D.

11   Q.    Did you speak with one of them or both of them?

12   A.    I spoke with both of them.

13   Q.    And where was that?

14   A.    This was in Freeport.

15   Q.    Before they had left to return to the US with

16   the aliens?

17   A.    Yes, sir.  I want to back up there a minute.  On

18   that last trip, I said that there were 28 aliens, but

19   it was 18 Indians and 10 Ecuadorians on that last

20   trip.  The agreement is $2,000.00 for the Ecuadorians

21   and the normal $2,600.00 for the Indians.

22   Q.    Did you have a discussion about these

23   arrangements?

24   A.    Yes, sir, that was all discussed before they

25   left, before they took the Indians and Ecuadorians on
```

```
 1   board.  This was discussed with both of them.  They
 2   both agreed to it.  Upon our agreement, they took the
 3   aliens.
 4   Q.   When you say both of them, who are you talking
 5   about?
 6   A.   Shawn Harris and Darryl Smith.
 7   Q.   Continue, sir.  I think you told us about going
 8   to Pittsburgh.  Why Pittsburgh?
 9   A.   That's where -- Pittsburgh was one of the places
10   that we had money stored in the US.  So any time we
11   run short on money, we go to one of those stops.  So
12   Pittsburgh happens to be the stop for me this time.
13   Q.   Did you fly into Pittsburgh?
14   A.   I fly into Pittsburgh.  Stayed at the Holiday
15   Inn.  I left with $100,000.00.  At this time, I
16   called D -- no, I spoke with Shawn first on the
17   phone.  He told me that D was carrying on pretty bad.
18   Q.   Why?  Did he tell you why?
19   A.   Yeah.  He said D believed that I was going to
20   duck out on paying him because he had already reached
21   with the aliens and had been waiting for some time
22   now.  So I told him, I said, let me speak with D.  I
23   was able to speak with D, I was able to show him that
24   I was leaving the following day and I would be there
25   to pay him his money that night.  Finally, I got a
```

```
 1   little panic.  I decided not to catch the flight no
 2   more, something was telling me don't catch the
 3   flight.  I decided to catch the bus which takes even
 4   much longer.  So I caught the bus from Pittsburgh,
 5   Pennsylvania.  Somewhere in Atlanta, I got tired of
 6   the bus, came off the bus, and jumped into a taxi.
 7   At this time, I'm communicating on a cellular -- no,
 8   no, no, i stopped and I used a pay phone first.  I
 9   called by boy Preston in Miami.  I told him to get in
10   the car and I said drive north.  I said, the further
11   you get north, then I will communicate with you on
12   cellular as I get into Florida.  He agreed.  As the
13   taxi got into Florida, I communicated on my cellular,
14   he told me how far he was.  I don't him where I was.
15   I told him to keep driving up.  At one point in
16   Jacksonville, I jumped out of the taxi into Preston's
17   vehicle.
18   Q.    And then what did you do?
19   A.    We proceeded back into the Miami area.  We
20   arrived in Miami at night shortly after 8:00 --
21   somewhere around 8:00, 9:00 o'clock at night.  At
22   this time now, it's been two days since I've seen
23   Shawn and D.  I arrive at the Holiday Inn.  Shawn
24   came shortly afterwards.  He told me at this time
25   that D had sold three of the aliens.  I was real
```

```
 1   pissed off at the time that he sold three aliens.  He
 2   sold two Ecuadorians and he sold one Indian.  I was
 3   mad because the aliens were worth much more than what
 4   he sold them for, $1,500.00 per alien.
 5   Q.    What do mean he sold them?
 6   A.    He called the families and gave the aliens to
 7   the family for $1,500.00 a piece.
 8   Q.    How much would you have charged them for a cold
 9   delivery, sir?
10   A.    Which would have been approximately $15,000.00.
11   Q.    So it was much more expensive?
12   A.    It was much more expensive, sir.  I was pretty
13   pissed off.  So when Shawn had the discussion,
14   shortly thereafter, D arrived.
15   Q.    Arrived where?
16   A.    At the Holiday Inn, Golden Glades, 163rd Street.
17   D came.  I came downstairs.  At this time, I had the
18   money on me.  He was sitting in a van if I could
19   recall.  I sat in the van with him along with Shawn.
20   While in the van, I asked him, how could you have
21   sold the people?  Okay?  He said that he wanted his
22   money, thought I was ducking out on him.  So we got
23   into a little argument.  I told him I never wanted to
24   work with him no more.  He's not a businessman.  And
25   besides that, Shawn had told me earlier that D had
```

```
 1   starved the people.  He didn't feed them in two days.
 2   So I was very, very angry that he starved these
 3   people for the past two days and didn't feed them
 4   because he thought I was ducking out on some money
 5   from him.  So I sat down in the van, paid him his
 6   money.  I think the correct amount of money if I
 7   could recall I paid D was $62,300.00.  $4,500.00
 8   deductible for the $1,500.00 that he received for the
 9   aliens.  I deducted that.  I did not deduct the
10   $4,000.00 that I gave Shawn because Shawn told me as
11   he got paid, he will pay me back.  D at this time
12   still had no idea and no knowledge about the
13   agreement between me and Shawn.  At this point, like
14   I said, the Ecuadorians was $2,000.00, the Indians
15   was $2,600.00.  If I can remember correctly, I think
16   I paid him a total of $62,300.00.  We then left and
17   went to the warehouse.  They left the aliens from the
18   warehouse.  I went inside and saw the aliens.  They
19   was pretty glad to see me.  Okay?  So I got them.  I
20   had a van at the time that was driven by one of my
21   workers.  Shawn was in his -- I think Shawn was in a
22   Blazer, his vehicle.  So we all followed D, went to
23   the warehouse, and collected the aliens.  D in return
24   asked me if he could assist in taking some of the
25   aliens to the house.  At this time, I refused because
```

```
 1   me and him had problems.  So I was thinking to
 2   myself, if he follow where these people was, he might
 3   create another problem.  He'd either call the police
 4   or he'd try to steal some more aliens.  So I didn't
 5   want nothing to do with him at this point.
 6   Q.   Was this the same warehouse that you talked
 7   about in the second trip?
 8   A.   Yes, sir.
 9   Q.   Okay.
10   A.   I left and while driving, I looked in the back
11   in the mirror, and I saw D.  He was still there.  So
12   I stopped --
13   Q.   What do you mean you saw D?  You saw him in
14   person?
15   A.   Yeah, he was inside the van, so I stopped.  And
16   he pulled over on the side of me.  I told him, I
17   said, you can go your way.  So he left and he went
18   his way.
19   Q.   Anybody else in that van?
20   A.   With D?
21   Q.   Yes.
22   A.   No, sir.
23   Q.   So he went his way.
24   A.   We went his way.  We went to the house.  We put
25   the people in the house.  They got some food.  I fed
```

```
 1    them, got some water.  I fed them and I left.  Went
 2    back to the Holiday Inn and I stayed.  Came back the
 3    following day, allowed everybody to communicate with
 4    their families, and -- while in that house, I think
 5    about four or five days, I moved the aliens out of
 6    the house because the neighbors to me appeared to be
 7    suspicious at this time.
 8            MR. GIBSON:  I'm going to object on the
 9    grounds of relevance.  What does this have to do with
10    Darryl Smith?
11    BY MR. RYAN:
12    Q.   What happened to these aliens?
13    A.   They was delivered to their families.
14    Q.   Were you paid?
15    A.   Yes, sir.
16    Q.   For those persons?
17    A.   Yes, sir.
18    Q.   As to the three persons who told us about before
19    who had been sold while you were still on your trip,
20    did you ever make money from them?
21    A.   Not me personally.  The people I worked for
22    received the money eventually.  When they did, I
23    cannot recall.
24    Q.   Is that the end of this third trip?
25    A.   Yeah, that was the last time I did a trip with
```

```
 1   D.
 2   Q.   Were you arrested sometime thereafter?
 3   A.   I was arrested about a month and a few weeks
 4   later.
 5   Q.   Did you ever see the person identified as D
 6   again?
 7   A.   I saw D maybe on or two occasions.
 8   Q.   Where?
 9   A.   I saw him at the hotel, I spoke with him on the
10   phone.  Because what happened, even though I didn't
11   want to work with him, he still was my last resort at
12   one point.  He was saying that I could cause him to
13   get locked up.  He started cursing and using
14   obscenities.  It got real out of hand.
15             MR. GIBSON:  Objection, move to strike.
16   BY MR. RYAN:
17   Q.   Did you ever again work with D?
18   A.   No, sir.
19   Q.   Now in your case, how is it that they came to
20   find out what you were doing?
21             MR. GIBSON:  Objection.  It's not relevant
22   to Darryl Smith's case.
23             MR. RYAN:  My argument would be to the
24   Court that it goes to the witnesses situation, so I
25   can bring it out.
```

1   BY MR. RYAN:

2   Q.   How were you arrested?

3            MR. GIBSON:   My only response to that would

4   be most respectfully that it is an attempt to attack

5   the character of the accused.   This is a convicted

6   person who is intercepted, and -- well, like saying

7   would apply to the accused in this case.   It's

8   completely irrelevant.

9   BY MR. RYAN:

10  Q.   Sir, how were you arrested?   What were the

11  circumstances that led to your arrest?   How did they

12  find out it was you?

13  A.   The circumstances that led up to my arrest was,

14  at one point, I think it was some time in August of

15  '98, the guy that I worked for, Nick Diaz, he hired

16  to smugglers to smuggle some people from the Bahamas

17  into the United States, as we later learned to be US

18  special immigration officers.   So because they became

19  a part of the operation, they knew a whole lot about

20  the operation, the people that was involved.   That

21  initially led to my arrest on December 1st.

22  Q.   They were working undercover and they caught

23  you?

24            MR. GIBSON:   Same objection, it's not

25  relevant.

```
 1              MR. RYAN:  I'll move from this area.
 2   BY MR. RYAN:
 3   Q.   Just a few more questions I have for you, Mr.
 4   Thompson.  First, you've talked about dealing with D
 5   and Mr. Harris, Shawn Harris.  In your dealings with
 6   these people, could you tell who was in charge?
 7              MR. GIBSON:  Objection, state of mind.
 8   BY MR. RYAN:
 9   Q.   From what you were able to see, did you have a
10   perception of who was in charge?
11              MR. GIBSON:  Same objection, state of mind.
12              MR. RYAN:  We'll deal with it in court.
13   BY MR. RYAN:
14   Q.   Go ahead, sir.
15   A.   Definitely on the last trip, I knew who was in
16   charge because on paying the money to D in the van
17   that night, okay, he told Shawn that he would pay him
18   tomorrow.  The following day, I saw Shawn Harris who
19   told me, he said, you know D only paid me $15,000.00
20   out of all that money?  I said, are you serious?  He
21   said yeah.  I said, how could you let him do that to
22   you?  His response is, it's his boat and he only
23   working for him.
24              MR. GIBSON:  Objection, move to strike.
25   BY MR. RYAN:
```

```
 1   Q.    Mr. Thompson, throughout all of your work in
 2   this alien smuggling operation, how much money did
 3   you make?
 4   A.    Several hundred thousands of dollars.
 5   Q.    What happened to it?
 6              MR. GIBSON:  Objection, relevance.
 7              MR. RYAN:  We'll let the Court decide.
 8              THE WITNESS:  I bought cars and properties
 9   and spent it on people and partying and travelling
10   and so forth.  I gave away a lot of money too.  I
11   bought boats.
12   BY MR. RYAN:
13   Q.    The boats, the cars, the property, are they
14   still in existence?
15              MR. GIBSON:  Objection, leading,
16   irrelevant.
17   BY MR. RYAN:
18   Q.    Go ahead, sir.
19   A.    No, sir, they they're not.
20   Q.    Do they still belong to you?
21   A.    No, sir.
22   Q.    Why not?
23   A.    Well most of them was sold.  Everything was
24   sold.  While in custody, my wife sold everything that
25   belonged to me.
```

```
 1   Q.    Does she have the proceeds of it?

 2   A.    I would hope so.

 3   Q.    So if she in fact does have the proceeds of it

 4   all, the money you've made from this or at least some

 5   portion of it is still under your control or her

 6   control?

 7   A.    There is no money under my control at this time.

 8   I can't say what money I have or if I have any money

 9   at this time.

10         MR. RYAN:    That's all I have.   I'll turn it

11   over to the defense counsel.

12                    CROSS EXAMINATION

13   BY MR. GIBSON:

14   Q.    I do have some questions for you, Mr. Thompson.

15   How long were you a policeman?   You said from

16   12/10/84 through May of 1998?

17   A.    Yes, sir.

18   Q.    So you resigned as a policeman prior to your

19   being arrested?

20   A.    Yes, sir.

21   Q.    Why?

22   A.    For two reasons.   I don't want to be the good

23   guy and the bad guy at the same time.   The second

24   reason, there's a lot of money in this business.

25   Q.    Did you take an oath when you became a police
```

```
 1 | officer?
 2 | A.   Yes, I did.
 3 | Q.   What was that oath?
 4 | A.   I swear allegiance to the Queen and to do my
 5 | duty without malice, ill will, and prejudice towards
 6 | one another.
 7 | Q.   Did you break that oath?
 8 | A.   I guess I did, sir.
 9 | Q.   You guess you did?
10 | A.   Yes, sir, I did.
11 | Q.   Are there any charges awaiting you in the
12 | Bahamas?
13 | A.   No, sir.
14 | Q.   How do you know that?
15 | A.   Well I know.  There's no charges.  The embassy
16 | was contacted.
17 | Q.   You took an oath today; didn't you?
18 | A.   Yes, sir.
19 | Q.   How do you understand that oath?  What does that
20 | oath mean to you?
21 | A.   Oath means to tell the truth, the whole truth,
22 | nothing but the truth.
23 | Q.   You gave some opinions in this case about what
24 | is going to happen to you.  Do you recall the
25 | Government asking you questions with respect to your
```

```
 1   deportation?
 2   A.   Yes, sir.
 3   Q.   How do you know what's going to happen to you?
 4   What's the basis for your opinion?
 5   A.   How I know I'm being deported?  I already
 6   received my deportation notice from the judge that I
 7   will be deported.  Okay?  I already saw immigration
 8   officers in Big Springs, Texas, who informed me that
 9   I would be deported, and that I was going to be
10   deported on the 12th of June.  So I gave my opinion
11   based on that fact, sir.
12   Q.   What about your opinion with respect to your
13   good behavior time off for your sentence?  What's the
14   basis for that opinion?
15   A.   Well on the fact that I was a no problem while
16   in prison.
17   Q.   What document or persons did you consult in
18   order to render this opinion that the Government
19   asked you for?
20   A.   I don't understand your question, sir.
21   Q.   You gave the Government an opinion about your
22   doing 18 months because you got time off for good
23   behavior.  You readily answered the Government's
24   question.  I'm only trying to determine what was the
25   basis for your sworn testimony in the form of an
```

```
 1   opinion.
 2   A.   I got 21 months as my time.  I did 18 months of
 3   the 21 months.  Because of my good time, I did 18
 4   months.
 5   Q.   What is your basis of information for knowing
 6   how to answer that question under oath in the form of
 7   an opinion?
 8   A.   Well being in prison, I was told that from the
 9   case manager that I received good time, got no
10   problem.  I received a certain amount of months off
11   for good time.
12   Q.   Where did you get your police training?
13   A.   In the Bahamas, Nassau.
14   Q.   Did you go through a police academy?
15   A.   Yes, I did.
16   Q.   For how long?
17   A.   Six months.
18   Q.   What variety of specialized law enforcement
19   training did you receive over this six month period?
20   A.   Well, came into the police theory, law,
21   practical.
22   Q.   Were you ever given practical training on being
23   a witness; yes or no?
24   A.   Yes, sir.
25   Q.   How many hours were you trained on how to be a
```

```
 1   witness?
 2   A.    I can't recall, sir.
 3   Q.    More than 8 to 10 hours would be fair?
 4   A.    Yes, sir.
 5   Q.    What were some of the things you were taught as
 6   to how to be an effective witness?
 7   A.    Answer the question directly, yes, no, stick to
 8   the point, stick to the question, and be truthful to
 9   the question.
10   Q.    How many times have you testified as a law
11   enforcement officer in a court of law?
12   A.    Many times.
13   Q.    More than 100 over a roughly 14, 15 year career?
14   A.    Yes, sir, I would say so.
15   Q.    More than a thousand times?
16   A.    No, sir.
17   Q.    Somewhere between 100 and 1,000.
18   A.    No, sir.  Somewhere around 100.
19   Q.    What was the area of practical specialization
20   that you were engaged in as a law enforcement officer
21   in the Bahamas?
22   A.    Drugs.
23   Q.    You testified in this proceeding today that you
24   had stash houses in the United States; didn't you?
25   A.    Yes, sir.
```

```
 1    Q.    If I am to boil this down to its essentials

 2    then, you are testifying under oath that you don't

 3    have any more stash houses; is that it?

 4    A.    No, sir, no more stash houses.

 5    Q.    Did you use your wife in divesting these stash

 6    houses?

 7    A.    My wife?

 8    Q.    Yes, sir.

 9    A.    No, sir.

10    Q.    The Government asked you a question with respect

11    to your cars -- let me be correct here on the

12    record -- your cars, properties, and boats; do you

13    recall?

14    A.    Yes, sir.

15    Q.    And you indicated that your wife sold

16    everything; is that accurate?

17    A.    Yes, sir.

18    Q.    And that you don't recall at this moment how

19    much money your wife received; is that accurate as

20    well?

21    A.    Yes, sir.

22    Q.    And that your wife is in possession of these

23    proceeds that you don't have any idea how much it is?

24    A.    Or if she has any.

25    Q.    These stash houses that you refer to where money
```

```
 1   was secret, did you use your wife --
 2   A.   Hold on.   Could you rephrase that question from
 3   the beginning for me?
 4   Q.   What part are you having difficulty with?
 5   A.   The first part.
 6   Q.   And that is?
 7   A.   You said something about the stash houses.
 8   Q.   Your oath indicated --
 9   A.   No, no, you went back too far.   The question you
10   was just asking me, the last question.
11   Q.   I'm confused now.
12   A.   You were referring to something about stash
13   houses and you said something about money.
14   Q.   I do recall that your testimony both on video
15   and by court reporter indicated that, particularly
16   around the line of questioning regarding Pittsburgh
17   and your movements to Pittsburgh, that you had --
18   A.   Yes, sir.
19   Q.   -- stash houses of case in the United States of
20   America.
21   A.   Yes, sir.
22   Q.   Was that the truth when you testified about it?
23   A.   Yes, sir.
24   Q.   Did you use your wife to divest these stash
25   houses of cash?
```

```
 1   A.    No, sir.

 2   Q.    Who did you use?

 3   A.    Pardon?

 4   Q.    Who did you use?

 5   A.    I didn't use anybody.  They was employed by the

 6   people that I worked for.

 7   Q.    So there was a buffer between you and the stash

 8   house with cash?

 9   A.    Yes, sir.

10   Q.    You didn't say that in your earlier testimony

11   though; did you?

12   A.    I wasn't asked.

13   Q.    So your testimony is then restricted as far as

14   your oath to tell the truth is what you were asked?

15   A.    I answered the question that was asked.

16   Q.    I appreciate that, thank you.  Did you ever

17   study the criminal laws?

18   A.    Which ones, United States or the Bahamas?

19   Q.    Both.

20   A.    No, sir, not in the United States.

21   Q.    How about the Bahamian criminal laws?

22   A.    Yes, sir.

23   Q.    You were also conversant of the Bahamian

24   Immigration and Customs regulations; weren't you?

25   A.    Yes, sir.
```

```
 1    Q.    Can you tell me in the form of an opinion how a
 2    boat can go to and from the Bahamas without there
 3    being a paper trail.
 4    A.    Without there being a paper trailer?  When you
 5    say paper trailer, what do you mean, sir?  If you
 6    could explain yourself.
 7    Q.    I'll move on for a moment.  You indicated that
 8    the first time you gave a statement was December 1st,
 9    1998, in Fort Lauderdale?
10    A.    That wasn't the first time I gave a statement.
11    Q.    When was the first time you gave a statement?
12    A.    It was about a week later.
13    Q.    What were the circumstances of your sworn
14    statement of December 1st, 1998?
15    A.    I never gave a sworn statement December 1st,
16    sir.
17    Q.    Were you in Fort Lauderdale, Florida, on
18    December 1st, 1998?
19    A.    Yes, sir.
20    Q.    Why were you here?
21    A.    I was arrested at that point in time, sir.
22    Q.    The money that you had in the stash house for
23    cash that you retrieved when you went to Pittsburgh,
24    was that also proceeds from alien smuggling or
25    something else?
```

```
 1   A.   Alien smuggling, sir.

 2   Q.   Were you ever a drug smuggler as well?

 3   A.   No, sir.

 4   Q.   So then you had a cadre?  You know what a cadre

 5   means, don't you?

 6   A.   No, sir.

 7   Q.   You had a group of boat captains and stash

 8   houses of persons, aliens, already in place; didn't

 9   you?

10   A.   Yes, sir.

11   Q.   Have you seen a single document that

12   corroborates your testimony today?

13   A.   Have I seen one here today, sir?

14   Q.   Yes.

15   A.   No, sir.

16   Q.   Have you been shown one since your arrest of

17   December 1st, 1998?

18   A.   On an interview that I gave to INS.

19   Q.   How about talking about your words.  I'm talking

20   about something that doesn't rely on your oath.

21   A.   No, sir.

22   Q.   Are you aware of any such corroborative

23   documents that exist?

24   A.   No, sir.

25   Q.   Is it your opinion that they don't?
```

```
 1            MR. RYAN:  Objection.
 2            THE WITNESS:  I don't know.
 3   BY MR. GIBSON:
 4   Q.   You bribed Bahamian officials?
 5   A.   Yes, I did.
 6   Q.   Where did the money come from?
 7   A.   From the proceeds of the alien smuggling.
 8   Q.   I see.  Did you plead guilty to those offenses?
 9   A.   Yes, I did.
10   Q.   How far back did your indictment go?
11   A.   My indictment went back as far as February of
12   '98, I think.
13   Q.   February of '98?
14   A.   If I can recall.
15   Q.   That means that you've made hundreds of
16   thousands of dollars between February of '98 and
17   December of '98?  That's ten months; wouldn't you
18   agree?
19   A.   Yes, sir.
20   Q.   Is that the truth; yes or no?
21   A.   When you say -- you're talking about the
22   organization making money itself or me personally,
23   what I made from it?
24   Q.   I'm asking you, my last question was about, was
25   it the truth; yes or no?
```

```
 1   A.   The truth about what, sir?

 2   Q.   You also indicated that you would collect money.

 3   From whom?

 4   A.   I would collect money from various --

 5   Q.   Names.

 6   A.   Stash houses in the United States.

 7   Q.   How many stash houses of case in the United

 8   States would you collect money?

 9   A.   How much money?  Sir, I don't understand your

10   question.

11   Q.   I see.  So when you testified that you would

12   collect money, were you unclear when you gave that

13   testimony?

14   A.   No.  I collect money from various stash houses

15   that are within the United States, yes, I did.

16   Q.   Do you know John Pintard?

17   A.   Yes, I know him.

18   Q.   How do you know him?

19   A.   Worked as one of my boat captains.

20   Q.   When was the last time you used John Pintard as

21   one of your boat captains?

22   A.   Um -- sometime in '98, I can't recall when was

23   the last time I used him, but I know it was i '98.

24   Q.   How about Sony, who is that?

25   A.   That's another one of my boat captains.
```

```
 1   Q.   What is Sony's Christian name?

 2   A.   His full name is -- if it's the same Sony that

 3   you're referring to that I'm thinking about, his full

 4   name is -- I think he's from Abaco.  He's a

 5   descendant from Abaco, Bahamas.  His full name -- I

 6   can't remember.

 7   Q.   How about Onas, another one of your --

 8   A.   Onas?

 9   Q.   Yes.

10   A.   No, sir, I never heard the name.

11   Q.   And Lenox Burrows?

12   A.   Yes, sir.

13   Q.   You know that person?

14   A.   Yes, sir.

15   Q.   They work for you as well?

16   A.   Yes, sir.

17   Q.   What did they do for you?

18   A.   He was also one of my boat captains.

19   Q.   So right now, you've got John Pintard, Sony, and

20   Lenox Burrows as boat captains for you?

21   A.   Yes, sir.

22   Q.   You used these people between February and

23   December of 1998?

24   A.   No, sir.

25   Q.   You used them before February?
```

```
 1   A.   I used them after February, and I stopped using
 2   them sometime in August.
 3   Q.   Okay.  So how many smuggling trips did you make,
 4   Mr. Thompson?
 5   A.   Many, sir.  Many.
 6   Q.   How many is many?
 7   A.   Twenty something, thirty something, I can't
 8   recall.  I made a lot.
 9   Q.   And none before February of 1998?  You're
10   absolutely sure under oath?
11   A.   That I made personally?
12   Q.   No, sir, that you were involved with personally.
13   A.   No.  I'm absolutely sure.
14   Q.   How would you come into the United States?
15   A.   Passport.
16   Q.   And what would be your visa?
17   A.   I didn't need a visa to come.
18   Q.   Why not?
19   A.   I'm a Bahamian citizen.  We don't need visas to
20   travel into the United States.  Just need a passport.
21   Q.   Your passport wouldn't be stamped at the United
22   States border or the border in --
23   A.   It's stamped in the Bahamas, yes.  The US
24   Immigration in the Bahamas would stamp it in the
25   Bahamas.
```

```
 1   Q.   What would it be stamped as?  B1?  B2?  What?
 2   You can come and go as you please?
 3   A.   They would give me a certain time period of I
 4   think six months.
 5   Q.   Where is your passport?
 6   A.   In possession of the US Immigration.
 7   Q.   Here in this country?
 8   A.   Yes, sir.
 9   Q.   Did you come into the country without having
10   your passport stamped by an immigration person in the
11   Bahamas, ever?
12   A.   No, sir, except the last trip I made when I was
13   arrested.
14   Q.   Did you share your given name of Bertis with
15   Shawn Harris?
16   A.   Pardon?
17   Q.   Do you ever tell him what your real name was?
18   Your real name is Bertis; isn't it?
19   A.   Did I ever tell who, sir?
20   Q.   Shawn Harris.
21   A.   I can't recall if I ever told him.  I think I
22   did, can't recall.
23   Q.   Did you have a fellow named Jim who was a
24   security guard in the Bahamas that worked for you?
25   A.   No, sir.
```

```
 1   Q.   And Sewell Thompson, do you know that name?

 2   A.   Yes, sir.

 3   Q.   Who is that person?

 4   A.   He was another organizer of alien smuggling.

 5   Q.   For whom?

 6   A.   For himself.

 7   Q.   Jerry Russell; do you know him?

 8   A.   I heard the name before.

 9   Q.   But you don't know him?

10   A.   No, sir.

11   Q.   Sean Russell; do you know him?

12   A.   No, sir.

13   Q.   So your organization, if I can understand it,

14   was you and Randy Woods, also known as Skipper?

15   A.   Yes, sir.

16   Q.   And your brother, Valentino Thompson?

17   A.   Yes, sir.

18   Q.   As well as an individual, Nick Diaz, also known

19   as Shetty (phonetic)?

20   A.   Yes, sir.

21   Q.   You were the supervisor of the operation by Nick

22   Diaz?

23   A.   Yes, sir.

24   Q.   Where did you get off hiring people if you were

25   only the supervisor?
```

| | |
|---|---|
| 1 | A. That was my job. |
| 2 | Q. So you didn't have to report to Nick Diaz with |
| 3 | respect to bringing new people into your close-knit |
| 4 | conspiracy? |
| 5 | A. No, sir. |
| 6 | Q. Why? |
| 7 | A. Because my job was to get the job done by any |
| 8 | means, so I did what I had to do to get the job done. |
| 9 | Q. So why then were you not Mr. Big yourself? |
| 10 | A. Why I wasn't Mister -- |
| 11 | Q. The big guy. If you had all of the authority |
| 12 | and you could do what you wanted to do, why weren't |
| 13 | you the person in charge? |
| 14 | A. Because one thing I didn't have, I didn't have |
| 15 | the connection in India. |
| 16 | Q. But you had all the connections in the Bahamas |
| 17 | and in the United States? |
| 18 | A. Yes. |
| 19 | Q. Have you ever heard of a partnership? |
| 20 | A. Yes, sir. |
| 21 | Q. Do you know what that means? |
| 22 | A. Yes, sir. |
| 23 | Q. Do you know Antoin Rahming? |
| 24 | A. Yes, sir. |
| 25 | Q. How do you know him? |

| | | |
|---|---|---|
| 1 | A. | I'm married to his sister. |
| 2 | Q. | Is Antoin Rahming an American citizen? |
| 3 | A. | No, sir. |
| 4 | Q. | Bahamian National? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And you are his brother-in-law? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Antoin went to jail? |
| 9 | A. | Yes, sir. |
| 10 | Q. | You testify against him? |
| 11 | A. | No, sir. |
| 12 | Q. | Who did? |
| 13 | A. | Nobody. |
| 14 | Q. | How do you know? |
| 15 | A. | I was there in Texas with him.  We stayed in the |
| 16 | | same area in the same housing facility. |
| 17 | Q. | You recruited Antoin Rahming; didn't you? |
| 18 | A. | Yes, sir. |
| 19 | Q. | To do what? |
| 20 | A. | Basically, he didn't do anything for me. |
| 21 | Q. | That's why you recruited him? |
| 22 | A. | Yes.  He just would hang with me. |
| 23 | Q. | And Preston, what did he do for you? |
| 24 | A. | He did the same thing, he hanged with me and he |
| 25 | | assists me in picking the people up from the stash |

```
 1   house in Miami, take them to bus station, the
 2   airport, and stuff like that.
 3   Q.   What was Preston's surname?
 4   A.   Albury.
 5   Q.   Did you know Shawn Harris's wife?
 6   A.   Yes, sir.
 7   Q.   What is her name?
 8   A.   I can't remember her name.
 9   Q.   Is she Bahamian?
10   A.   Yes, sir.
11   Q.   How long have you known Shawn Harris's wife?
12   A.   I've known her --
13   Q.   How many years?
14   A.   Personally, I just got to know her in '98
15   dealing with Shawn, but I knew of her and seen her
16   for many years in Freeport.  She lives in Freeport,
17   but she used to live in Freeport with her mother.
18   Q.   Your home town?
19   A.   No, sir.  I just spent my last six years in
20   Freeport.
21   Q.   Okay.  Your last six years was the home town of
22   Shawn Harris's wife?
23   A.   Yes.
24   Q.   Small community; isn't it?
25   A.   Yes, sir.
```

1  Q.   Did Shawn Harris's wife have any role in your

2  meeting Shawn Harris?

3  A.   No, sir.

4  Q.   How did you know who his wife was?

5  A.   She was with him when he came at one point.   I

6  saw her.   She was sitting in the Blazer.

7  Q.   Meaning that was the question you weren't asked;

8  is that right?

9  A.   Yes, sir.

10  Q.   You recognized her on sight?

11  A.   Yeah.

12  Q.   Did you make any mention about why Shawn Harris

13  has his wife with him during supposedly a

14  conspiratorial meeting with you?

15  A.   At the time when I saw Shawn Harris's wife,

16  there were no Indians aboard, it just was a --

17  Q.   A social meeting?

18  A.   Yeah, a social meeting.   You know, had breakfast

19  and stuff like that, but there was no -- other than

20  that, there was no business being conducted at the

21  time when I met Shawn Harris's wife.

22  Q.   Again, the whole truth is that you knew Shawn

23  Harris outside of a conspiratorial setting?

24  A.   No, sir.

25  Q.   How do you explain the last oath in this record

1   by you that you had an unrelated meeting with Shawn

2   Harris and Shawn Harris's wife?

3   A.    I didn't understand your question the first time

4   too, but I did have meetings with him on a social

5   level.

6   Q.    Where?

7   A.    Right here in Miami for breakfast.  We did

8   things like that.

9   Q.    What else?

10  A.    We went to night clubs.

11  Q.    You socialized with Shawn Harris?

12  A.    Yes, sir.

13  Q.    Did you ever socialize with Darryl Smith?

14  A.    No, sir.

15  Q.    Now in February of 1999, you were debriefed by

16  the United States Government; were you not?

17  A.    Yes, sir.

18  Q.    And you implicated Darryl Smith as D, as the

19  person that you paid the money to?

20  A.    Yes, sir.

21  Q.    Up until that time, had you ever mentioned

22  Darryl Smith's name of D's name; yes or no?

23  A.    No, sir.

24  Q.    But you indicated to the Government in response

25  to the Government's questions that you initially gave

```
 1   your sworn testimony or sworn statement to the
 2   Government a week or a week and a half after you were
 3   arrested?
 4   A.    I first speak to the Government --
 5   Q.    About your involvement a week to a week and a
 6   half after you were arrested?
 7   A.    Yes, sir.
 8   Q.    Have you ever told a Government agent that your
 9   brother, Valentino, took aliens to a stash house in
10   the Miami, Florida area.
11   A.    Yes, sir.
12   Q.    How many times?
13   A.    Several occasions.
14   Q.    That there was a phone number for the house?
15   A.    Yes, sir.
16   Q.    Whose name was that phone in?
17   A.    I can't recall.
18   Q.    What was the phone number?
19   A.    I can't remember, sir.
20   Q.    You mean to tell me hundreds of thousands of
21   dollars of profit to you and your organization
22   depends upon you taking good care of these people who
23   are your collateral for -- and you don't remember the
24   telephone number?
25   A.    No, sir.
```

```
 1   Q.    I see.  Do you recall testifying today in this
 2   proceeding that you were concerned about the welfare
 3   of the aliens under your care?
 4   A.    Yes, sir.
 5   Q.    Do you recall where the stash house was; yes or
 6   no?
 7   A.    Yes, sir.
 8   Q.    What was the precise physical address?
 9   A.    I can't give you the precise address, sir.  I
10   can give you my best recollection of Texas, but the
11   precise address, I can't give it to you.
12   Q.    Why has your recollection failed on this point?
13   A.    I've been in prison for 19 months.  I've been
14   through a lot.
15   Q.    You remembered so much detail in response to the
16   Government's questions; yet, a stash house that you
17   essentially were in control of, you don't remember
18   the telephone number to?
19   A.    Um --
20   Q.    Nor the physical address to?
21   A.    It was on 6th Street -- 6th Avenue off 163rd
22   Street, I'll tell you that much, sir.
23   Q.    How was the house obtained?
24   A.    My brother.
25   Q.    Valentino?
```

```
 1   A.   Yes, sir.
 2   Q.   By your direction?
 3   A.   Yes, sir.
 4   Q.   How was it rented?
 5   A.   Just making payments.
 6   Q.   In whose name?
 7   A.   I don't know whose name he put the house in or
 8   how he did that.  But he just did what I told him, to
 9   get a house, and he did that.
10   Q.   You never asked your brother about the security
11   of that stash house, sir?  Is that your oath?
12   A.   Yes, sir.
13   Q.   Now who did Doc work for?
14   A.   Who is Doc?  Only one Doc I could recall, sir.
15   Doc worked directly with my brother, Valentino.
16   Q.   What did he do?
17   A.   He assists with the language of speaking with
18   the aliens.  He assists also in communicating with
19   their families.  He assists with putting them on the
20   buses and airplanes.  He did stuff like that, sir.
21   Q.   Did you know if Shawn Harris owned a boat in
22   1998; yes or no?
23   A.   Yes, sir.
24   Q.   Describe the boat that Shawn Harris owned, if
25   you can.
```

```
 1   A.    It was a -- the boat was a 28 -- to the best of
 2   my recollection, sir, I think the boat was a
 3   28-footer, reddish and white color.  That's the best
 4   of my recollection.
 5   Q.    How many times had you seen Shawn Harris's boat,
 6   Mr. Thompson?
 7   A.    I went on it once in the ocean and it cut off on
 8   me, and we turned back around.
 9   Q.    What were the circumstances of you being on
10   Shawn Harris's boat, Mr. Thompson?
11   A.    I was trying to get the boat to Freeport to use
12   it to smuggle in some aliens.
13   Q.    You testified in front of the Grand Jury?
14   A.    Yes, I did.
15   Q.    Was there a court reporter present?
16   A.    I can't remember.
17   Q.    Did you mention Darryl Smith's name?
18   A.    I can't remember.
19   Q.    Did you mention the name of D?
20   A.    I can't remember.
21   Q.    Why?
22   A.    There was a lot of questions being asked.  I
23   really can't say exactly what all I was asked at the
24   time, sir.
25   Q.    You bribed immigration officials?
```

```
 1   A.    Yes, I did.

 2   Q.    For what purpose?

 3   A.    The purpose to allow the aliens into the

 4   Bahamas.

 5   Q.    Didn't you testify that those aliens were in

 6   possession of passports?

 7   A.    Yes, but the aliens are on stop listing as far

 8   as coming into my country.

 9   Q.    They're under what?

10   A.    Under what we call a stop list.

11   Q.    What does that mean?

12   A.    They don't allow certain people to enter the

13   country, like Indians, Chinese, and so forth and so

14   on.

15   Q.    You mean there's a racial exclusion of certain

16   groups of people in your country.

17   A.    I guess they feel as though they use the country

18   in order just to get to America.

19   Q.    Were these persons that you claim were Indians,

20   did they look as if they were Indian Nationals?

21   A.    Yes, sir.

22   Q.    Did they go through customs procedures; yes or

23   no?

24   A.    Yes, they did.

25   Q.    Where are their passports?
```

1   A.   Most of them I burned.

2   Q.   Did you make any copies?

3   A.   Of the passports?

4   Q.   Yes, sir.

5   A.   No, sir.

6   Q.   You testified in some detail with respect to

7   what those passports indicated.  Again, you destroyed

8   the corroboration for your testimony; is that true?

9   A.   Yes, sir.

10  Q.   Why?

11  A.   I guess I didn't want to be caught with a

12  handful of passports at the time, so I destroyed

13  whatever evidence I had linking me to the aliens.

14  Q.   When did you destroy this evidence?

15  A.   I would normally destroy it on the boat, maybe a

16  week, two weeks at the most.

17  Q.   You indicated under oath that there was a

18  problem with one of the loads, a payment problem with

19  Darryl Smith; do you remember?

20  A.   Yes, sir.

21  Q.   Do you remember testifying that you called the

22  stash house?

23  A.   Pardon?

24  Q.   Do you recall testifying that you called the

25  stash house to check on the health and well-being of

```
 1   the aliens?

 2   A.    I never recall saying I called the stash house.

 3   Q.    How else would you supervise it?

 4   A.    I said I called and I spoke to Shawn.

 5   Q.    Exactly.

 6   A.    Yes, sir.

 7   Q.    What number did you call?

 8   A.    I can't recall the number.

 9   Q.    How did you reach Shawn?

10   A.    By phone.

11   Q.    Cellular phone, hard line, or what?

12   A.    I think it was cellular phone at the time, sir.

13   Q.    When you went to Atlanta, were you in possession

14   of a cellular phone yourself?

15   A.    Yes, sir.

16   Q.    What was its number?

17   A.    I can't recall.

18   Q.    You forgot your own telephone number?

19   A.    Yes, sir.

20   Q.    So would it be fair to say the only things you

21   do remember are the things that incriminate Darryl

22   Smith?

23   A.    No, sir.

24   Q.    Who made the cellular phone that you can't

25   remember?
```

1   A.    Pardon?

2   Q.    What was the manufacturer of the phone?

3   A.    It was a local company like you buy at a Radio

4   Shack.

5   Q.    What was the name of the phone?

6   A.    I can't remember.

7   Q.    What cellular phone company did you use?

8   A.    I made payments.  It was a pre-payment phone,

9   one of those phones with a pre-payment.  You pay the

10  money in the store and they put minutes on the phone.

11  It was that type of phone I had.  Then I had another

12  phone that was connected to my country through

13  BellTelco Communications.

14  Q.    Was your name on that account?

15  A.    Yes, it was.

16  Q.    Your correct name?

17  A.    Yes, it was.

18  Q.    What was that telephone number?

19  A.    I can't remember any of my cellular numbers,

20  sir.

21  Q.    So you meet Shawn Harris in 1998.  You all

22  become fast associates; is that fair to say?

23  A.    Yes, sir.

24  Q.    You immediately start breaking the law with him?

25  A.    Yes, sir.

```
 1   Q.   Who vouches for him?

 2   A.   Who vouches for Shawn?

 3   Q.   You're a careful man.  You arrest people for

 4   breaking the law.  You testified you were only

 5   breaking the law from February through December --

 6   A.   I didn't testify to that, breaking law from

 7   February to December.

 8   Q.   The record will reflect what your words are.   At

 9   any rate, that you even took the step of burning

10   incriminating evidence.

11   A.   Yes, I did.

12   Q.   You meet a guy one day and the next day you

13   start smuggling aliens with him.  Does that make

14   sense to you, Mr. Thompson?

15   A.   No, sir, it makes no sense.

16   Q.   So who vouched for Shawn Harris when you started

17   breaking the law with him?

18   A.   Shawn Harris was a man previously working for

19   me, but without my knowledge.

20   Q.   Employed by your brother Val?

21   A.   No, sir.  Employed by Randy Woods.

22   Q.   Did Randy Woods employ Darryl Smith?

23   A.   No, sir.

24   Q.   Randy Woods was a boat captain himself?

25   A.   No, sir.
```

1    Q.    Did Randy Woods need a boat captain?

2    A.    Pardon?

3    Q.    Did he need a boat captain?

4    A.    Yes, sir.

5    Q.    You had several.  You had John Pintard, you had

6    Sony, you had Lenox Burrows.  Were they not

7    available?

8    A.    I don't know at the time if they were available,

9    but -- I couldn't say.

10    Q.    So you meet Shawn Harris at the Xanadu Hotel in

11    Freeport, Bahamas, around April of '98?

12    A.    Yes, sir.

13    Q.    Was Shawn on his own boat?

14    A.    He was on a boat that I found out to be -- that

15    belonged to D.

16    Q.    So he wasn't on his own boat?

17    A.    He didn't have a boat at the time that belonged

18    to him.  At that time.

19    Q.    How do you know that if you only met him for the

20    first time?

21    A.    Because once when he was paid that money, the

22    $15,000.00 from D, he gave me $4,000.00, and he told

23    me that he was going to buy himself a boat.  And

24    that's what he did, he went and he bought a boat.

25    That's how come I knew when he bought the boat.

```
 1    Q.   Your Uncle Skipper, you weren't satisfied as
 2    having him as a go-between, so you went directly to
 3    who was apparently a total stranger to you?
 4    A.   Yes, sir, but he wasn't a stranger to my
 5    brother.
 6    Q.   You testified in response to the Government's
 7    questions that you were given telephone numbers and
 8    you stayed in communication; do you recall that?
 9    A.   Could you repeat the question?
10              MR. GIBSON:   May I have it read back, Madam
11    Reporter?
12                   (Thereupon the pending question was
13                        read back.)
14    BY MR. GIBSON:
15    Q.   Do you recall testifying today that you were
16    given telephone numbers to keep in communication with
17    Shawn Harris?
18    A.   Yes, sir.
19    Q.   How many telephone numbers were you given?
20    A.   I got a beeper number, I got a cellular number,
21    and I got a house phone number for Shawn at that
22    time.
23    Q.   Did you ever beep Shawn Harris and he not call
24    you back; yes or no?
25    A.   Yes, sir.
```

```
 1   Q.   Do you know a gentleman by the Buzzard?

 2   A.   No, sir.

 3   Q.   You've testified you did three separate alien

 4   loads.  How many did you do directly or indirectly

 5   with Shawn Harris?

 6   A.   You said directly with Shawn?

 7   Q.   How many?

 8   A.   Three.

 9   Q.   How many before you knew Val was working them?

10   How many?

11   A.   I'd say about four.

12   Q.   Four plus three?

13   A.   Yes, sir.

14   Q.   Equalling seven?

15   A.   Yes, sir.

16   Q.   And you would say that roughly you would do 28

17   to 30 aliens per load?

18   A.   Not the first four loads.

19   Q.   But you did testify you did about 30?

20   A.   No, sir.

21   Q.   How many alien smuggling trips did you do?

22   A.   You said alien smuggling trips or aliens that

23   was on board?  I don't understand your question, sir.

24   Q.   Alien smuggling trips, Mr. Thompson.

25   A.   30, 30-something.
```

```
 1   Q.    If you multiply that on average as you testified
 2   in response to the Government's questions --
 3   A.    Uh-huh.
 4   Q.    -- you can factor that by 30?  Multiply that by
 5   30; right?
 6   A.    Multiply by 30?
 7   Q.    Yes, sir.
 8   A.    30 aliens?
 9   Q.    30 aliens?  30 trips?
10   A.    No, sir, it wouldn't be a direct statement.
11   Q.    Would it be under --
12   A.    That trip wasn't 30.  It wasn't 28.
13   Q.    How much did you make per alien?
14   A.    $1,000.00, $500.00 sometimes.
15   Q.    You said a go-fast boat would pick the aliens
16   up?
17   A.    Yes, sir.
18   Q.    Who owned the go-fast boat?
19   A.    Shawn and D.
20   Q.    Was a go-fast boat used in your testimony about
21   a smuggling trip in April of 1998; yes or no?
22   A.    No, sir.
23   Q.    Was a go-fast boat used in the smuggling trip
24   that you testified to in response to the Government's
25   questions roughly June or July of '98; yes or no?
```

```
 1   A.   No, sir.

 2   Q.   Was a go-fast boat used in the so-called last

 3   trip of October of 1998?

 4   A.   No, sir.

 5   Q.   You testified in response to the Government's

 6   questions that your protocol was to use a go-fast

 7   boat offshore, transfer the aliens off the go-fast

 8   boat to the larger vessel to be smuggled into the

 9   country?

10   A.   Yes, sir.

11   Q.   Is that the truth?

12   A.   Yes, sir.

13   Q.   Why did you change your protocol with Shawn

14   Harris?

15   A.   Because of the go-between.

16   Q.   You mean Skipper would use the go-fast boat and

17   you wanted to cut Skipper out?

18   A.   Yes, sir. Skipper would use Sean Burry

19   (phonetic) that has a go-fast boat.  He would use

20   him.

21   Q.   And how much money would Sean Burry be paid for

22   the use of the go-fast boat?  You said what?

23   A.   I don't know what Sean Burry was paid, but I

24   paid Skipper $3,000.00.

25   Q.   So you wanted to save $3,000.00?
```

```
 1   A.    I wanted to save -- I couldn't the $3,000.00.  I
 2   was able to save $400.00 out of the $3,000.00.
 3   Q.    And you cut out a blood relative to use a total
 4   stranger to save $3,000.00; is that your testimony?
 5   A.    Yes, it is.
 6   Q.    You indicated that you dealt with the alien
 7   personally; do you recall?
 8   A.    Sometimes, yes, I did.
 9   Q.    Did you tell them your true name?
10   A.    If I did?
11   Q.    Would you tell them your true name; yes or no?
12   A.    Yes, sir.
13   Q.    You would show them your identification so they
14   could identify you?
15   A.    No, sir.
16   Q.    So you would not tell them your true name?
17   A.    Yes, I would.  If they asked, I would.
18   Q.    You were not concerned about being reported to
19   authorities should one of them be caught; yes or no?
20   A.    Yes, sir, there was a concern.
21   Q.    How were you able to testify to events in the
22   United States that you did not witness?
23   A.    I can only testify to what I seen or what I
24   heard.
25   Q.    You testified a lot about things that you heard.
```

```
 1   How are you able to under oath testify about things
 2   you did not see.
 3             MR. RYAN:  Objection, vague.
 4   BY MR. GIBSON:
 5   Q.   You can answer.
 6   A.   I couldn't testify about something I didn't see.
 7   Q.   You don't recall ever, Mr. Thompson, testifying
 8   in this record about things you were told?
 9   A.   Yes, sir, I did.
10   Q.   That you did not witness?
11   A.   Yes, I did.
12   Q.   How can you do that reliably when you did not
13   witness them yourself?
14             MR. RYAN:  Objection, question for the
15   Court.
16             THE WITNESS:  I just said what someone told
17   me.  I just said it.
18   BY MR. GIBSON:
19   Q.   So if someone told someone else something about
20   you --
21   A.   Yes, sir.
22   Q.   -- that was not witnessed by that person, would
23   you consider that to be reliable?
24             MR. RYAN:  Objection, irrelevant.
25   BY MR. GIBSON:
```

```
 1   Q.   You may answer.

 2   A.   80 percent, yes, sir.

 3   Q.   These flights that you made into the United

 4   States, where are your plane tickets?

 5   A.   Where are the tickets?

 6   Q.   Yes, sir.

 7   A.   I don't know.

 8   Q.   Has anyone shown you any tickets so far?

 9   A.   No, sir.

10   Q.   You indicated that you were taken to a

11   warehouse?

12   A.   Yes, I was.

13   Q.   Had you ever told that to a Government agent

14   before today; yes or no?

15   A.   I can't recall.

16   Q.   You indicated you met Darryl Smith in a hotel

17   room at the hotel Xanadu, the Xanadu Hotel in

18   Freeport, Bahamas; do you recall?

19   A.   Yes, sir.

20   Q.   Is that the first time you claim to have met

21   Darryl Smith face to face?

22   A.   Yes, sir.

23   Q.   Who else was present?

24   A.   Shawn.

25   Q.   Anyone else?
```

```
 1   A.   Nobody else I can recall right now, sir, no.

 2   Q.   Not that you can recall, so you're not saying

 3   there was no one else there, you are saying that you

 4   don't remember?

 5   A.   Best of my recollection, there was no one there,

 6   that's what I'm saying, sir.

 7   Q.   Do you know the circumstances of the trip if it

 8   occurred at all, the reason for it?

 9   A.   Yes, sir.

10   Q.   How do you know that?  By your eyes?  Ears?

11   A.   No, sir, by communicating with Shawn.

12   Q.   That's something that you heard?

13   A.   No, I communicated with Shawn.

14   Q.   You can talk about Shawn Harris.  Did you

15   communicate with Darryl Smith with respect to why he

16   was in the Bahamas that day; yes or no?

17   A.   Yes, sir.

18   Q.   Did you determine if there were any other

19   persons travelling with Darryl Smith at that time?

20   A.   No.   It was just Darryl Smith and Shawn.

21   Q.   So you're saying under oath that he didn't have

22   any family members with him other than Shawn Harris?

23   A.   No, sir, no other family members.

24   Q.   You're sure of that?

25   A.   I'm sure.
```

```
 1   Q.    And you were introduced into a hotel room that,
 2   that's my brother?
 3   A.    Yes, sir.
 4   Q.    Anything else?
 5   A.    No, sir.
 6   Q.    Then how do you know who his travelling
 7   companions were if that's all you were told?
 8   A.    Like I said, the only person who was there was
 9   Shawn.
10   Q.    I didn't ask you that question.  I'm asking you
11   the question --
12   A.    I answered --
13   Q.    How do you know what circumstances Darryl Smith
14   was travelling to the Bahamas that day, if at all,
15   and who his travelling companions were?  And you just
16   cited in this record that you saw him in a hotel room
17   with his brother.
18   A.    Yes, sir.
19   Q.    How are you then able to extrapolate from that
20   that he was travelling with Shawn Harris and not with
21   someone else?
22   A.    Because I told you, I was saying earlier, I
23   spoke with Shawn Harris earlier who told me that him
24   and his brother would be coming, that I had a load
25   for them waiting for them.
```

```
 1   Q.   Again, something you were told.

 2   A.   Pardon?

 3   Q.   Something you were told.  You didn't witness

 4   this, you were told this.

 5   A.   I was told by Shawn, yes, sir.

 6   Q.   And you now say that Darryl Smith, not having

 7   known you Adam's house cat, propositions you to break

 8   the law for his benefit; is that the truth?

 9   A.   Yes, sir.

10   Q.   Were you in uniform, police uniform?

11   A.   At this time, I had already quit.

12   Q.   Were you in police uniform in April of 1998?

13   A.   No, sir.

14   Q.   Were you in police uniform during your briberies

15   of immigration officials?

16   A.   No, sir.

17   Q.   Did you ever break the law, Mr. Thompson,

18   wearing the proud uniform; yes or no?

19   A.   No, sir.

20   Q.   That again is what you say; correct?

21   A.   Yes, sir.

22   Q.   Now you testified that during this same meeting

23   in June or July of '98, there was a guy with Shawn

24   Harris who represented Darryl Smith?

25   A.   Yes, sir.
```

```
 1   Q.   Who was that person?

 2   A.   Darryl Smith.

 3   Q.   Who was the guy with Shawn who represented

 4   Darryl Smith?  Who was that person?

 5   A.   Darryl Smith.

 6   Q.   And just the three of them, huh?  Darryl Smith,

 7   his clone, and this other person?

 8   A.   No, sir.  Darryl Smith, Shawn Harris, and

 9   myself.

10   Q.   And you indicated in response to the

11   Government's questions that you guys were in the same

12   boat?

13   A.   Yes, same boat.

14   Q.   And you weren't asked any questions about Shawn

15   Harris's boat, how you got to be on it, and how it

16   broke down, anything like that; right?

17   A.   Questions only?

18   Q.   Yes.

19   A.   Shawn had no boat at that time.

20   Q.   When did Shawn get his boat again?

21   A.   Shawn got his boat after the last trip they did

22   for me, sometime in October.

23   Q.   So between the last trip in October and your

24   indictment in November?

25   A.   I was indicted December 1st, sir.  That's when I
```

```
 1  got my indictment.
 2  Q.   Weren't you indicted as a co-defendant of Nick
 3  Diaz, also known as 19 Shetty in Dallas, Texas?
 4  A.   Yes, sir.
 5  Q.   Do you have any opinion as a trained police
 6  officer and a person who obviously asks a lot of
 7  questions as to when Nick Diaz was indicted in
 8  Dallas, Texas?
 9  A.   No, sir.
10  Q.   Now you've never testified anything about Dallas
11  in this case; have you?  And you got to be indicted
12  in Dallas, Texas.
13  A.   Yes, sir, sure did.
14  Q.   But all of that was after February of 1998;
15  correct?
16  A.   Yes, sir.
17  Q.   Did you have a beeper that started with the
18  number 340?
19  A.   Yes, sir.
20  Q.   What was the rest of your beeper number?
21  A.   3024.
22  Q.   How long did you have that beeper?
23  A.   Almost three years.
24  Q.   Was every call you got on that beeper a criminal
25  call?
```

```
 1   A.    No, sir.
 2   Q.    Were most of the calls you got on that beeper a
 3   criminal call?
 4   A.    No, sir.
 5   Q.    Were there ever any codes used by you and Shawn
 6   to identify yourself when you were sending beeps?
 7   A.    No, sir.
 8   Q.    Do you know of anyone at Bimini Island Air; yes
 9   or no?
10   A.    No, sir.
11   Q.    Have you ever heard of it?
12   A.    No, sir.
13   Q.    How many times have you met Robert Baruby?
14   A.    I don't know the name, sir.
15   Q.    How many times have you claimed under oath that
16   you were indigent and have no money?
17   A.    Twice.
18   Q.    How much money was in the stash house, total,
19   when you went to Pittsburgh to pick up the money?
20   A.    I don't know.
21   Q.    You didn't take it all; did you?
22   A.    No, sir.
23   Q.    Have you ever pointed the authorities to that
24   location of the stash house?
25   A.    Yes, sir.
```

```
 1   Q.   For what purpose?
 2   A.   What purpose I told them?
 3   Q.   Yes.
 4   A.   I told the Government I would cooperate and give
 5   truthful statements, my involvement of my crime, and
 6   that's what I did.
 7   Q.   You said you stayed at a Holiday Inn off 163rd
 8   Street?
 9   A.   In Miami, yes, sir.
10   Q.   Are you sure about that?
11   A.   Sure, positive.
12   Q.   It's across the street from another motel?
13   A.   In the rear of it.
14   Q.   How did you pay?
15   A.   Cash.
16   Q.   How did you pay for your airfare?
17   A.   Cash.
18   Q.   What names did you use in the hotel?
19   A.   My name, Bertis Thompson.
20   Q.   Did you make telephone calls from the hotel?
21   A.   Yes, I did.
22   Q.   Did you deposit cash as to the deposit with the
23   hotel?
24   A.   Yes, I did.
25   Q.   Were you owning a credit card at that time?
```

```
 1   A.    Yes, I was.
 2              MR. GIBSON:  Nothing else.
 3              MR. RYAN:  Finished, Counselor?
 4              MR. GIBSON:  Yes, at this point.
 5                   REDIRECT EXAMINATION
 6   BY MR. RYAN:
 7   Q.    Just a couple on redirect, Mr. Thompson.  First,
 8   the stash houses in the US where money was kept, the
 9   money that was kept in them, was that money your
10   personal profit?
11              MR. GIBSON:  Object to the form, it's
12   leading.
13   BY MR. RYAN:
14   Q.    You can answer.
15   A.    No, sir.
16   Q.    What was that money?
17   A.    It was money that belonged to the organization.
18   Q.    When you were arrested, did you speak to -- in
19   the course of your cooperation, did you speak to
20   agents about these stash houses?
21   A.    Yes, sir.
22   Q.    Did you give their locations as best you could?
23              MR. GIBSON:  Object to the form, it's
24   leading.
25              THE WITNESS:  Yes, I did.
```

```
 1   BY MR. RYAN:

 2   Q.   Do you know if any of the agents ever went to

 3   those homes and received any money or anything like

 4   that?

 5            MR. GIBSON:  Object to the form, leading.

 6   BY MR. RYAN:

 7   Q.   Do you know?

 8   A.   No, sir, to my knowledge, persons were arrested.

 9   Q.   Persons were arrested where, at the stash

10   houses?

11   A.   Yes, sir.

12   Q.   Counsel was asking you about a stash house in

13   Miami where you couldn't recall the address; do you

14   remember that?

15   A.   Yes, sir.

16   Q.   If you were out on the street today, could you

17   get to it?

18   A.   Yes, sir, right away.

19   Q.   And Counsel was asking you about properties your

20   wife divested --

21            MR. GIBSON:  Objection.  I didn't ask, he

22   shared that on direct examination.  I crossed on it.

23            MR. RYAN:  Thank you so much.

24   BY MR. RYAN:

25   Q.   The properties that you talk about that your
```

```
 1   wife divested, where were those properties?
 2   A.    Freeport, Grand Bahamas.
 3   Q.    As far as the properties in the US such as the
 4   stash houses, did you or your wife have any sort of
 5   ownership interest in those?
 6   A.    No, sir.
 7            MR. GIBSON:  Object to the form, it's
 8   leading.
 9   BY MR. RYAN:
10   Q.    When was the last time you saw Shawn Harris?
11   Before or after the arrest, your arrest?
12   A.    I saw Shawn some time in November.
13   Q.    Of what year?
14   A.    Of 1998.
15   Q.    Before your arrest?
16   A.    Yes, sir.
17   Q.    Once you were arrested, did you ever see Shawn
18   Harris again?
19   A.    No, sir.
20   Q.    Have you ever spoken to him about your testimony
21   or your cooperation?
22   A.    No, sir.
23            MR. RYAN:  Thank you.  That's it.
24                 (Deposition concluded.)
25
```

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA
      COUNTY OF BROWARD:
 3
              I, the undersigned authority, certify that
 4    BERTIS THOMPSON appeared before me and was duly sworn.

 5            WITNESS my hand and official seal this 17th
      day of July, 2000.
 6

 7
      DONNA L. MITCHELL
 8                    Shorthand Reporter and Notary
                      Public-State of Florida
 9

10

11
                 REPORTER'S DEPOSITION CERTIFICATE
12
      STATE OF FLORIDA
13    COUNTY OF BROWARD:

14            I, DONNA L. MITCHELL, Shorthand Reporter,
      certify that I was authorized to and did stenographically
15    report the foregoing deposition, and that the transcript
      is a true record of the testimony given by the witness.
16
              I further certify that I am not a relative,
17    employee, attorney or counsel of any of the parties, nor
      am I a relative or employee of any of the parties'
18    attorney or counsel connected with the action, nor am I
      financially interested in the action.
19
              Dated this 17th day of July, 2000.
20

21

22    DONNA L. MITCHELL
      Shorthand Reporter
23    CC903927, Exp. 2/11/04

24

25
```