UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-60610-CR-FERGUSON

UNITED STATES OF AMERICA, )
)
vs. )
)
DARRYL SMITH, )
Defendant. )
_____)

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPPRESS STATEMENT

The United States of America, by and through the undersigned Assistant United States

Attorney, hereby responds to Defendant's Motion to Suppress a statement made by him while in

custody but before the administering of Miranda warnings.

FACTS:

On March 15, 2000, agents of DEA, U.S. Customs and other agencies executed a Search

Warrant on the home of the defendant, Darryl Smith located at 1030 N.W. Little River Drive,

Miami. See Attachment A. Such search warrant authorized agents to search for, among other

items, "weapons, including firearms." Probable cause to search for firearms was based on

statements from a cooperating witness, defendant's half-brother, who stated that defendant was

in possession of a .38 caliber revolver. In fact, the indictment charging defendant included a

charge against defendant of Possession of a Weapon by a Convicted Felon. Defendant's prior

conviction emanated from an armed robbery in which a firearm was used by a co-conspirator to

kill a store clerk. See Attachment B. Finally, it was known to agents that defendant's home had

elaborate security features including video cameras and a wrought iron fence with an electric

gate.



Upon execution of the search warrant, the defendant was taken into custody and handcuffed. Defendant's wife was also briefly placed in handcuffs while the agents made sure no other persons were present in the house. Agents on the scene intended to and did release the wife upon securing the residence. Agents also briefly released defendant from handcuffs to allow him to use the bathroom. However, for their own safety, agents first asked defendant, before administering the Miranda warnings, where the guns were located in the house so that they could be secured and not be available to either the defendant or his wife or anyone who might enter the residence. In response, defendant stated that he had sold his guns. Defendant now seeks to suppress his statement as a violation of Miranda.

### LEGAL DISCUSSION

The United States submits that the above-stated facts along with other evidence to be presented at a hearing regarding this motion would show that defendant's statement should not be suppressed by virtue of the exception to the Miranda requirement first recognized by the Supreme Court in the case of United States v. Quarles, 467 U.S. 649 (1984). In Quarles, a police officer arrested a man in a supermarket wearing a shoulder holster but without a firearm. Believing the weapon was nearby and a potential threat to public safety, the officer questioned the man without administering the Miranda warnings. The Court upheld such questioning by the officer because of the existing threat to public safety. Id. At 655-656. Other courts examining the issue in cases similar to the case at bar have also upheld such questioning. United States v. Shea, 150 F.3d 44, 48 (1st Cir. 1998); United States v. Edwards, 885 F.2d 377, 384 (7th Cir. 1989); United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1989).

For these reasons, the undersigned submits that defendant's motion should be denied.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:    _____

EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY
Bar No. A500053
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, FL 33394
Telephone: (954) 356-7255 x 3514
Fax: (954) 356-7336

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _13_

day of September, 2000 to: Joseph Gibson, 19 W. Flagler St., Suite 720, Miami, FL 33130.

_____

EDWARD R. RYAN
ASSISTANT UNITED STATES ATTORNEY

ERR.hkp

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. 00-2413-Turnoff

IN RE: **MOTION TO SEAL**
**SEARCH WARRANT,**
*SEARCH WARRANT APPLICATION*
**AND AFFIDAVIT**

---

## MOTION TO SEAL

COMES NOW the United States of America, by and through the undersigned Assigned United States Attorney, and respectfully requests that the Search Warrant, Search Warrant Application and Affidavit and accompanying documents and Sealing Order in the above-captioned matter be filed under seal (except for copies to be used by law enforcement personnel during execution of their official duties in the investigation) until further order of this Court in order to prevent the defendant from fleeing upon learning that the search warrant has been filed.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

BY: _____

EDWARD R. RYAN (A5500053)
ASSISTANT UNITED STATES ATTORNEY
500 EAST BROWARD BOULEVARD, 7TH FL
FORT LAUDERDALE, FLORIDA  33394
TELEPHONE: (954)356-7255
FACSIMILE: (954)356-7336

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. OO-2413-Turnoff

IN RE: MOTION TO SEAL
SEARCH WARRANT,
SEARCH WARRANT APPLICATION
AND AFFIDAVIT

## ORDER TO SEAL

This comes before the Court on the government's Motion to Seal. Considering the grounds raised in the Motion, and the Court being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED that the Motion is granted. The Clerk of the Court is directed to file under seal (except for copies to be used by law enforcement personnel during execution of their official duties in the investigation) the Search Warrant, Search Warrant Application, Affidavit and accompanying documents and this Order until further order of the Court.

DONE AND ORDERED in chambers at Miami, Florida this �history day of March, 2000.

~~JOHN O'SULLIVAN~~
UNITED STATES MAGISTRATE JUDGE

cc:  S/A DE ANGELUS
     AUSA EDWARD R. RYAN

- 2 -

# *United States District Court*

| SOUTHERN | DISTRICT OF | FLORIDA | )n |
|---|---|---|---|

the Matter of the Search of
(Name, address or brief description of property or premises to be searched)

The Residence at 1030 NW Little River Drive in
Miami is a one story home west of Route 441 on the south
side of Little River Drive which is NW 8th Street.
Attached photographs provide further description of the
exterior of the residence). See Attachment A

## **SEARCH WARRANT**

**CASE NUMBER:** OO-2443 Turnoff

TO: ___Special Agent ALFRED DE ANGELUS_____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___Special Agent ALFRED DE ANGELUS____who has reason to
                                                                                    Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

The Residence at 1030 NW Little River Drive in Miami is a one story home west of Route 441 on the south side of Little River
Drive which is NW 8th Street. (Attached photographs provide further description of the exterior of the residence). See Attachment
A.

in the _____SOUTHERN_____ District of _____FLORIDA_____, there is now concealed a certain
person or property, namely (describe the person or property).

See Attachment "B"

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so
described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before___ 3)26)2000

                                                                                    Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search
(in the daytime - 6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has been established)) and if the person
or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written
inventory of the person or property seized and promptly return this warrant to ___JOHN O'SULLIVAN W. L. Turner IF
as required by law.                                                                 U.S. Judge or Magistrate Judge

3)14)2000    1:15(—

_____        at Miami, Florida_____
Date and Time Issued                  City and State

JOHN O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer        Signature of Judicial Officer

                                          Date 3/14/00

cr-06061-WDF        Document 46    Entered on FLSD Docket 09/15/2000    P

# United States District Court

___SOUTHERN___ ___DISTRICT OF___    **FLORIDA** ___

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

The Residence at 1030 NW Little River Drive in
Miami is a one story home west of Route 441 on the south
side of Little River Drive which is NW 8teth Street.
Attached photographs provide further description of the
exterior of the residence). See Attachment A

### APPLICATION AND AFFIDAVIT
### **SEARCH WARRANT**

**CASE NUMBER:** OO-2413-Turnoff

I _____ALFRED DE ANGELUS_____ being duly sworn depose and say:

I am a(n) _Special Agent with the United States Customs Service_____ and have reason to believe
                          Official Title

that □ on the person of or ☒ on the premises known as (name, description and/or location)

The Residence at 1030 NW Little River Drive in Miami is a one story home west of Route 441 on the south side of Little River Drive which
is NW 86th Street. (Attached photographs provide further description of the exterior of the residence). See Attachment A.

in the _____SOUTHERN_____ District of _____FLORIDA_____

there is now concealed a certain person or property, namely (describe the person or property)

See Attachment "B"

which is (give alleged grounds for search and seizure under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence of a commission of a crime, contraband, fruits of a crime or property used or intended for use as the means of committing the crime.

in violation of Title _21_____ United States Code, Section(s) ____841(a)(1)_____
The facts to support the issuance of a Search Warrant are as follows:

### SEE AFFIDAVIT

Continued on the attached and made a part hereof.    ☒ Yes □ No

Signature of Affiant
ALFRED DE ANGELUS, SPECIAL AGENT
UNITED STATES CUSTOMS SERVICE

Sworn to before me, and subscribed in my presence

3/14/2000

Date

at       ___Miami, Florida___
        City and State

JOHN O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

## ATTACHMENT A

Physical description of **1030 NW Little River Drive, Miami, Florida**:

The residence at 1030 NW Little River Drive in Miami is a one story home west of Route 441 on the south side of Little River Drive which is NW 86th Street. The attached photographs provide further description of the exterior of the residence.





## ATTACHMENT B

Property to be Seized

1.     Controlled substances held in violation of 21 U.S.C. 841(a)(1).

2.     Paraphernalia for using, packaging, processing, diluting, weighing, and distributing controlled substances, to wit: scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, pipes, butane torches, lighters, and the like.

3.     Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances whether on paper or stored electronically by computer, electronic diary, etc.

4.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances.

5.     Cash, currency, and records relating to income and expenditures of money and wealth from controlled substances, to wit: money order, wire transfer and cashier's check receipts and bank statements, passbooks, checkbooks, and check registers.

6.     Items of personal property which tend to identify the person(s) in residence, occupancy, control or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.     Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel/motel/rent-a-car statements, correspondence with travel agencies and other travel related businesses, airline/rent-a-car/hotel frequent flier/user cards and statements, passports, and other papers relating to domestic/international travel.

8.     Weapons including firearms.

9.     Registration documents for cars boats, etc.

## AFFIDAVIT

I, Alfred R. De Angelus, having first been duly sworn, do hereby state and depose the following:

1.      I am a Special Agent with the United States Customs Service ("Customs"), United States Department of the Treasury, Office of the Special Agent in Charge, Miami, Florida, and have been so employed since July, 1997. Prior to my employment as a Special Agent with Customs, I was employed as an Inspector with Customs for approximately six (6) years, with assignments that included membership on Contraband Enforcement Teams (CET), and as a Program Officer in the U.S. Customs Commissioner's Office of Anti-Smuggling.

2.      As a Customs agent, I am trained and experienced in the methods used by narcotics smugglers pertaining to the importation, warehousing and distribution of cocaine, heroin, marijuana and other narcotic drugs. I have participated in the seizure of thousands of pounds of cocaine, marijuana, and heroin and in the arrests of more than two hundred defendants. I am currently cross-designated by the Drug Enforcement Administration to conduct investigations pertaining to violations of the Controlled Substances Act pursuant to Title 21, United States Code, Section 873(B).

3.      I have participated in numerous investigations involving the controlled delivery of narcotic substances, and in the execution of numerous search warrants. I have also had experience in debriefing defendants, participant witnesses, informants, and other persons who have had personal experience and knowledge of the amassing, spending, converting, transporting, distributing and concealing of the proceeds of drug smuggling/trafficking.

4.      Based upon my training and experience, I am aware that:

A)    based upon my experience and training, as well as the corporate knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia in their residences. Furthermore, it is generally a common practice for drug traffickers to maintain in their residence records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (i.e., sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Additionally, telephone/address listing of clients and suppliers necessarily must be maintained and immediately available in order to efficiently conduct their drug trafficking business. Moreover, it is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or to be utilized to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. Such records and financial evidence are typically retained by traffickers on a long-term basis whether a trafficker is in possession of narcotics at any particular time.

B)    I know that those engaged in narcotics trafficking on a continuing basis, such as Darryl SMITH as detailed throughout this affidavit continue their trafficking activities consistently over time. Thus, where there is evidence that a trafficker has engaged in illegal narcotics trafficking

2

over a period of months as in this case, it is probable that he will continue to engage in such activity or retain some evidence of narcotics trafficking in the future.

          C)      that when narcotics smugglers amass large proceeds from the transportation and sale of drugs, they usually attempt to legitimize these profits. To accomplish this goal, narcotic smugglers utilize domestic/foreign banks and their attendant services, securities, cashiers' checks, money drafts, letters of credit, real estate, and business fronts. Additionally, smugglers regularly purchase vehicles, vessels, and/or aircraft with complete or large partial cash payments;

          E)      that narcotics smugglers and traffickers commonly take, or cause to be taken, photographs of themselves, their associates, their property and their product. These photographs are usually maintained in their possession;

          F)      that the courts have recognized that unexplained wealth is probative evidence of crime motivated by greed, in particular, the smuggling/distribution of controlled substances;

          G)      that narcotics smugglers sometimes have in their possession, that is, on their person, at their residence, or at their businesses, firearms including, but not limited to handguns, rifles, shotguns, machine guns and other weapons. Said weapons are used to protect and secure a narcotics smuggler's property and as a tool of the trade within the narcotics business.

## INVESTIGATIVE BACKGROUND

      5.      I am currently involved, along with other federal law enforcement officers, in an investigation of an individual named Darryl Zanuck SMITH. To date, this investigation has revealed that SMITH is involved in an organization that smuggles large quantities of marijuana, cocaine and

3

illegal undocumented alines and is "laundering" and/or transporting large sums of United States currency that are proceeds from the smuggling ventures.

6.    This investigation began on February 27, 1999. On that date, the affiant arrested Sean Devon HARRIS, (SMITH's half-brother) and Bahamian National, Wilton Edwin ELLIS aboard a 35' LUHRS Sports Fisherman vessel that contained 463 pounds of marijuana. The vessel was traveling from Freeport, Bahamas to South Florida. SMITH was the registered owner of the 35' LUHRS Sports Fisherman vessel.

7.    Darryl Zanuck SMITH, DOB: 08/20/59 is employed as a longshoreman at the Port of Miami, and has a criminal history that includes: willful killing; armed robbery; carrying a concealed weapon; and cocaine possession.

8.    Immediately upon his arrest, Harris agreed to cooperate. Harris identified SMITH as the organizer of the importation. Harris placed a recorded call to SMITH and told him of the arrest and seizure. It is clear from the conversation and context that SMITH was fully aware of the smuggling scheme for which Harris was arrested. Furthermore, it is clear that HARRIS reports to SMITH as a superior in the scheme. Harris has pled guilty to a trafficking offense and has been debriefed several times regarding SMITH as detailed below:

9.    Sean Harris first came to the attention of federal agents in November of 1998, after he had been observed at a stash house operated and maintained by an alien smuggling organization. The stash house, located at 1537 NW 40th Street in Miami, Florida, was searched pursuant to a warrant on November 9, 1998. As a result of the search warrant, the agents discovered several smuggled aliens, all Indian Nationals.

4

10. Harris was interviewed by USBP agents on the afternoon of November 9, 1998, and stated that he had leased the stash house approximately two weeks prior to his being interviewed. Harris told the interviewing agents that he was aware that the house would be used to harbor smuggled aliens.

11. When questioned by USCS Agents De Angelus and Fariello on 09/06/99, during one of his debriefings, Harris admitted that he and SMITH transported three loads of aliens aboard SMITH's black and white yacht (the 35' LUHRS Sports Fisherman seized on 02/27/99). HARRIS claimed that he participated in the smuggling of 6-7 Indian Nationals from Bimini, Bahamas to Miami in August or September of 1998. Other persons involved in the smuggling scheme, confirmed that HARRIS worked for SMITH in the venture.

12. HARRIS stated that the second and third loads consisted of 30 and 28 Indian Nationals respectively who were picked up at the Xanadu Marina in Freeport, Bahamas, approximately one month apart. HARRIS claimed that SMITH was the person actually paid the transportation fee, receiving $3,000 per alien, with HARRIS receiving $500.00 per alien.

13. In addition to his role in the alien and narcotics smuggling activities as delineated above, HARRIS admitted to having taken part in the theft of a container from within Port Everglades during January of 1998. HARRIS claimed that he, SMITH, and a group consisting of several Jamaican males cut a fence within the Foreign Trade Zone (FTZ) at Port Everglades in order to steal a container from the docks utilized by the United States Customs, Port Everglades Anti-Smuggling Unit (PEV/ASU).

14. HARRIS stated that the container was supposed to have contained approximately 5000 pounds of marijuana secreted within a load of scrap metal that had arrived from Jamaica.

5

SMITH and the Jamaican males had been notified that the container was being held by Customs for examination and believed that the marijuana had not yet been discovered. HARRIS claims that after cutting the fence, a semi-tractor was driven into the FTZ, where it then hooked up to the container and was driven off the port.

15.    According to HARRIS, SMITH had arranged for a trucker that he knew from the Port of Miami to take the container in the early morning hours without authorization. HARRIS was unable to recall the exact date, but remembered that the theft occurred on a Saturday morning. HARRIS stated that the container was taken to a warehouse in Miami, where it was opened and found to contain only the scrap metal.

16.    HARRIS stated that SMITH and the Jamaican males were angry that the marijuana had already been removed without them having been notified. The container was then taken to a location in Miami and abandoned with the scrap metal still inside.·

17.    Analysis of seizure data for Port Everglades for the time period of January 1998 revealed that on Friday, January 23, 1998, members of the PEV/ASU conducted a Landed Quantity Verification (LQV) of the TECMARINE vessel "LENGAI", which had arrived from Jamaica. Container #UXXU 451339 (the container), containing scrap metal, was targeted for intensive examination by the Manifest Review Unit (MRU). When examined by the inspectors, the container was discovered to have 101 un-manifested boxes hidden behind the scrap metal at the nose of the container. The boxes were found to contain approximately 5100 pounds of a green leafy substance that subsequently field tested positive for the presence of marijuana. The marijuana was removed without disturbing the load of scrap metal, with the container being left at the PEV/ASU loading dock.

18.    On Sunday, January 25, 1998, USCS S/A Fortmann was notified that the container had been stolen from the FTZ. Investigation by the Broward Sheriff's Office confirmed that the FTZ enclosure's southwest gate had been accessed by unknown person(s) who had cut the lock from the gate. The container was recovered on Monday, January 26, 1998 after having been reported abandoned at 7131 NW 26th Street, Miami, Florida. The container was found to still contain the scrap metal.

19.    HARRIS has told the affiant that SMITH leases and maintains a warehouse located at 1363 NW 74th Street, in Miami, Florida. The affiant has confirmed that SMITH does lease this warehouse location and that the lease will not expire until June 30, 2000. The affiant has conducted surveillance of this location but has never observed any sort of normal business activity. According to HARRIS, the warehouse is utilized by SMITH to store triple axle boat trailers (used in SMITH's small vessel narcotics smuggling) and to weigh, package, store and distribute smuggled narcotics. SMITH gave HARRIS a key to the warehouse prior to HARRIS' arrest on 02/22/99. HARRIS was still in possession of the key, and slept at the warehouse on several occasions since his arrest, most recently, Friday night, October 15, 1999.

20.    HARRIS reported that in the early morning hours of Saturday, October 16, 1999, SMITH and two other males arrived at SMITH's warehouse in a beige passenger van. HARRIS stated that SMITH and the two other males proceeded to unload approximately 38 cardboard boxes containing approximately 1330 pounds of marijuana from the van.

21.    According to HARRIS, SMITH told him that he had removed the marijuana filled boxes from a container that had arrived at the Port of Miami from Jamaica. HARRIS stated that the three men then took between 300-400 pounds of marijuana each and left the warehouse. HARRIS

7

stated that SMITH took approximately 300 pounds from the warehouse, and believed SMITH then took the marijuana to his residence located at 1030 NW Little River Drive, Miami, Florida.

22.     During HARRIS' final contact with SMITH in or about December, 1999, SMITH told HARRIS to be ready to participate in a marijuana load some time around Christmas.

23.     In an effort to confirm the removal of marijuana from a container at the Port of Miami, the affiant contacted Contraband Enforcement Team (CET) Supervisory Inspector Dave Mckinney.  Mckinney related that he had retrieved a voice-mail message from Charles J. MUSSOLINE, Security Manager at SEABOARD MARINE, on Monday morning, October 18, 1999 following his return from out of town.  The message had been left on Mckinney's voice-mail on Friday, October 15, 1999.

24.     MUSSOLINE had received information from Jamaica, that container # SMLU 491700-0 had been alerted to by a narcotics detecting K-9 in Jamaica.  The container had arrived at the Port of Miami on board the motor vessel (M/V) SEABOARD SUN on Friday, October 15, 1999.  Upon retrieving the message, Mckinney sent inspectors to examine the container.  The inspectors discovered that the container had already been accessed, as evidenced by it's lack of any high security shipping seals on the rear doors of the container.  Upon opening the rear doors, the inspectors found a large void space on the left side of the container approximately one third of the way toward the nose.

25.     Container # SMLU 491700-0 (the container) was taken to the CET docks for further examination.  On Tuesday, October 19, 1999, Special Agents De Angelus and Catterton met with SCI Mckinney and Charles MUSSOLINE at the offices of SEABOARD MARINE.  MUSSOLINE was requested to provide any documentation relative to Container # SMLU 491700-0.  Documents

8

provided by MUSSOLINE revealed that the container was removed from the ship on Saturday, October 16, 1999 at approximately 5:50 p.m., and that at the time the container was removed from the ship, it lacked door seals.

26.     MUSSOLINE further provided the bill of lading (BOL) for the container. The BOL showed that the container had been sealed with two high security seals prior to having been loaded aboard the ship in Jamaica. Both the shipper and consignee are well established and long term importers and exporters. It is unlikely that the consignee has any involvement in the suspected narcotics importation.

27.     On January 12, 2000, as part of a plea agreement, Wilton Edwin ELLIS, who was arrested with HARRIS, plead guilty and began cooperating with law enforcement.

28.     On January 24, 2000, Wilton Edwin ELLIS was debriefed relative to his arrest on 02/27/99 aboard the 35' Sports fisherman vessel owned by Darryl Zanuck SMITH, and specifically to how he had become associated with SMITH and HARRIS. After having identified Darryl SMITH from a photograph, ELLIS related the following:

29.     ELLIS claims that he first met SMITH and HARRIS on the island of North Bimini, Bahamas. ELLIS recalled that it was most likely a Friday or Saturday, approximately two to three weeks prior to his February 27, 1999 arrest. ELLIS stated that he was asked if he would like to make some money by accompanying SMITH and HARRIS back to Miami, Florida aboard SMITH's boat. ELLIS was promised $2000.00 to help transport eighty (80) pounds of marijuana.

30.     ELLIS agreed to make the trip, and boarded the vessel. ELLIS stated the marijuana was brought on board the vessel in two duffel bags, and consisted of two, 40 pound bales for which SMITH had paid $6000.00. ELLIS claims that SMITH's vessel departed North Bimini for a marina

9

in Miami. Upon arrival at the marina, ELLIS stated he, HARRIS, and SMITH got into SMITH's Isuzu Rodeo with the marijuana, and traveled to a warehouse in Miami, that was owned or leased by SMITH. ELLIS was unable to recall the exact location of the warehouse, but did recall that it was NW 70-something in Miami. The warehouse previously referred to in this affidavit that is leased by SMITH is located at 1363 NW 74th Street, Miami. HARRIS confirmed this account.

31.     ELLIS claims that he and SMITH left the warehouse in order to retrieve a scale for weighing the marijuana, and a knife to cut it up. ELLIS was unable to recall the exact location, but said that it was a house off of Route 441. (SMITH's residence is located at 1030 NW Little River Drive, approximately one block west of Route 441.) SMITH and ELLIS then returned to the warehouse, where SMITH weighed and cut up the bales.

32.     ELLIS returned to Bimini, and was contacted by a Bahamas based smuggler who sought an individual with a boat who could transport 1500 pounds of marijuana to South Florida. ELLIS called SMITH to find out when he could come to get it. ELLIS stated that SMITH arrived two days later, believed to be February 19, 1999. This is confirmed by the discovery of a Bahamian Cruising Permit dated February 19, 1999 aboard SMITH's vessel at the time of it's seizure on 02/27/99.

33.     Shortly after midnight on February 20, 1999, ELLIS got onto SMITH's boat, and helped load approximately 50 bales of marijuana. Upon arrival back in Miami, SMITH and ELLIS took the marijuana off the vessel and loaded it into a blue van for transport to the NW 74th Street warehouse. ELLIS and SMITH drove the van into the warehouse, where the marijuana was weighed and was found to be a little over 900 pounds, not the 1500 that ELLIS had thought they had loaded in Bimini.

10

34.    Several days later, ELLIS contacted SMITH about coming to Freeport, Bahamas to pick up a load. ELLIS claimed not to know how much marijuana or cocaine they were to pick up in Freeport, only that they would be picking up a load from his Bahamian contact. ELLIS met SMITH and HARRIS at a marina in Miami on Saturday, February 27, 1999. ELLIS and HARRIS got on board the yacht, and departed for Freeport, Bahamas.

35.    ELLIS and HARRIS arrived in Freeport, Bahamas at approximately 1615 hours on February 27, 1999, and took a slip at the Xanadu Marina. A short while later, ELLIS and HARRIS met with several Bahamian males and then took the vessel around to an adjacent channel in order to load the marijuana (the 463 pounds seized on 02/27/99).

36.    Upon their return to South Florida, ELLIS and HARRIS were arrested.

37.    On March 2, 2000, the affiant spoke to Sean HARRIS. HARRIS stated that SMITH has elaborate security features at his residence located at 1030 NW Little River Drive. HARRIS stated that surveillance cameras on the outside of the residence are wired to a monitor in SMITH's master bedroom, and further, that SMITH dead bolts the interior bedroom doors and is in possession of a .38 caliber snub-nose revolver formally owned by HARRIS. HARRIS has also stated that SMITH keeps a computer in his home. HARRIS has stated to the affiant that he observed marijuana in bedrooms inside the house behind deadbolt locks on several occasions with the last occasion being approximately one year ago. HARRIS stated that SMITH often used his residence to store marijuana. The windows of the residence are protected by electric roll down storm shutters, with most being fully closed. Additionally, the yard is secured by an approximately six-foot tall wrought iron, remote-controlled fence/gate. The affiant conducted surveillance at the residence and confirmed HARRIS' description of the exterior. The affiant noted that no other home in the area had

11

such security features. The affiant has also determined that both SMITH and his wife are convicted felons and cannot lawfully possesses a firearm.

38. On March 9, 2000, a Federal Grand Jury sitting in Fort Lauderdale, FL, returned an indictment charging SMITH with narcotics offenses for acts described in this affidavit.

39. As part of the execution of these search warrants, agents will employ ion scan technology which will pick up and identify even minute trace amounts of controlled substances. These trace amounts can be detected even if the controlled substances were stored at that location months before. This technology acts like a vacuum to collect microscopic trace amounts of narcotics that may measure as little as parts per billion. Thus, in the unlikely event that SMITH has not possessed controlled substances at either of the search locations in the past several months, the ion scan technology will still allow trace amounts of evidence to be collected.

40.    Based on the above listed facts and circumstances, in my opinion, there exists probable cause to believe that Darryl Zanuck SMITH, who resides at 1030 NW Little River Drive, Miami, Florida 33150, and who maintains a warehouse located at 1363 NW 74th Street, Miami, Florida, is a smuggler and distributor of narcotics. Further, I believe that evidence of SMITH's drug activities and related financial transactions will be found during a search of this residence and warehouse.

FURTHER AFFIANT SAYETH NAUGHT.

ALFRED R. DE ANGELUS
SPECIAL AGENT
UNITED STATES CUSTOMS SERVICE

Sworn and subscribed to me this ____
day of March, 2000.

UNITED STATES MAGISTRATE JUDGE

13

| IDS No. | | Agency Code | Municipal P.D. Def. ID No. | | MOPD Records and I D No. | | | Court Case No. |
|---|---|---|---|---|---|---|---|---|
| | | 30 | | | | | | 86-16753 |

| DEFENDANT'S NAME | Last | First | Middle | | DOB mo/day/yr | Sex | Race | Ethnic | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SMITH, DARRYL ZANUCK | | | | | -06 / 20 / 59 | M= | B | | 5-6 | 150 | BLK | BRN |

| LOCAL ADDRESS | Street | City | State | | Zip | Phone | | Alias |
|---|---|---|---|---|---|---|---|---|
| 8035 NW 115 AVE. | | MIA.FLA | | | | NONE | | DARRYL |

| PERMANENT ADDRESS | Street | City | State | | Zip | Phone | | Address Source ☐ Verbal ☐ Voter's ID |
|---|---|---|---|---|---|---|---|---|
| SMME | | | | | | NONE | | ☒ Driver's License ☐ Other |

| BUSINESS ADDRESS | Street | City | State | | Zip | Phone | | Occupation | Place of Birth |
|---|---|---|---|---|---|---|---|---|---|
| NONE | | | | | | NONE | | LABORER | MIA.FLA |

| DRIVER'S LICENSE NO. | | State | | Social Security No. | | Scars, Tattoos, Unique Physical Features |
|---|---|---|---|---|---|---|
| S53017959300 | FLA | | | 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 | | L.E.O. LFT ARM THREE UPPER GOLD TEET |

| WEAPON | Arrest Date mo/day/yr | Arrest Time | | Arrest Location (include name of business) |
|---|---|---|---|---|
| ☒ Yes No☐ | 06 / 13/ 86 | n 6:49 ☐A.M. ☒P.M. | SW 72 ST APPROX.58 CT. | |

| CO-DEFENDANTS | Last | First | Middle | DOB mo/day/yr | | | |
|---|---|---|---|---|---|---|---|
| 1 McGOWAN, RICKY | | | | 09 / 29 / 66 | ☒ In Custody ☐ At Large ☒ | ☐ Felony ☐ Juvenile ☐ Misdemeanor |
| 2 TAYLOR, TIMOTHY | Last | First | Middle | 08 / 16 / 66 | ☒ In Custody ☐ At Large ☒ | ☐ Felony ☐ Juvenile ☐ Misdemeanor |

| CHARGES | STATUTE | ☐ AC ☐ CAPIAS ☐ BW ☐ FW ☐ PW ☐ CIT ☐ VIOLATION OF SECT |
|---|---|---|
| 1 CARRYING CONCEALED FIREARM (2)cts. | 790.052 | |
| 2 CONSPIRACY COM.ARMED ROBBERY | 888777.04. | |
| 3 PO&S.COCAINE 1/4 GRAM | 893.13 | DADD = CC |
| GRAND THEFT AUTO.(OVERDUE RENTAL) | 812.014 | OF THE CODE OF 21.81.1a |

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant On the 13 day of JUNE 19 86 At 6:49 ☐A.M. ☒P.M. S.DIXIE AND SW 93 ST. (Time) (Location, include name of business) committed the following violation of law: Narrative; (Be specific) THIS OFFICER OBSERVED THE ABOVE DEFENDANT DRIVING A

DARK GRAY CHEVROLET SEDAN NORTHBOUND ON S.DIXIE HIGHWAY OCCPIED BY THREE OTHER BLACK MALES.

THE VEHICLE MATCHED THE DISCRIPTION OF A VEHICLE JUST SEEN IN THE KENDALL LIQUOR STORE PARKING

LOT CIRCLING THE LOT WHERE A WITNESS OBSERVED A SHOTGUN IN THE VEHICLE, AND ON ONE DEFENDANT.

THIS OFFICER FOLLOWED THE VEHICLE,A 1986 CHEVROLET BEARIN 86?FLA I48zsp.REGISTERED TO BORMAN LF

CORP. FOUND TO BE AN OVERDUE RENTAL.THE VEHICLE AND ALL DEFENDANTS WERE STOPPED AT SW.72 st.

AND APPROX.58 CT. BY UNIFORM UNITS AND DETECTIVE UNITS. TRANSPORTED TO STA# 5 DEF.SMITh WAS

FOUND TO HAVE 1/4GRAM OF COCAINE IN HIS WALLET,AND WAS ADVISED OF HIS RIGHTS PER MIRANDA BY

DET.CRAVENS.DEF.STATED HE HAD BEEN ABDUCTED BY THE OTHER DEFENDANTS AT GUN POINT AND FORCED TO

DRIVE THEM TO KENDALL LIQUOR STORE SO THEY COULD ROB SAME.A STATEMENT MADE BY DEF.McGOWAN, HOW

EVER ACCUSES DEF.SMITH OF PLANNING THE ROBBERY,AND PROVIDING THE FIREARMS AND VEHICLE. THE

WITNESS ON THE SCENE AT KENDALL LIQUOR STATES THREE DEFENDANTS WERE OUT OF THE VEHICLE ARMED

LEAVING DEF.SMITH ALONE TO PROVIDE GET AWAY TRANSPORTATION.

PAGE 1 OF 1

Hold for Other Agency
Agency _____ Verified By _____

☒ HOLD FOR BOND HEARING
☐ DO NOT BOND OUT (Officer Must Appear at Bond Hearing)

I Swear that the above Statement is correct and true to the best of my knowledge and belief.

E. CAMDELL

Officer's Name (Print)

Officer's Signature

Department Name / Court ID Number

Sworn to and subscribed before me, the undersigned authority, within _____ day of _____

Deputy Clerk / Notary Public

COURT COPY

I understand that should I willfully fail to appear before the court as required by this notice to appear that I may be held in contempt of court and a warrant for my arrest shall be issued. Futhermore, I agree that notice concerning the time, date, and place of all court hearings should be sent to the above address. I agree that it is my responsibility to notify Clerk of the Court (Juveniles notify Family Division Juvenile Section) anytime that my address changes.

You need not appear in court, but must comply with the instructions on the reverse side hereof.

Signature of Defendant/Juvenile and Parent or Guard

| DEFENDANT'S NAME | Last | First | Middle | | DOB mo/day/yr | Sex | Race | Ethnic | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Taylor, | Timothy | Lee | | 08/16/66 | M | B | I | 511 | 160 | Bk | Bn |

| LOCAL ADDRESS | Street | City | State | Zip | Phone | Alias |
|---|---|---|---|---|---|---|
| 1520 N.W. 50 St. | Miami, Fl. 33151 | | | | 693-5713 | Unknown |

| PERMANENT ADDRESS | Street | City | State | Zip | Phone | Address Source ☒ Verbal ☐ Voter's ID |
|---|---|---|---|---|---|---|
| Same As Local | | | | | Same | ☐ Driver's License ☐ Other |

| BUSINESS ADDRESS | Street | City | State | Zip | Phone | Occupation | Place of Birth |
|---|---|---|---|---|---|---|---|
| None | | | | | None | Laborer | Miami, Fl. |

| DRIVER'S LICENSE NO | State | | Social Security No | | Scars, Tattoos, Unique Physical Features |
|---|---|---|---|---|---|
| None | | | Unknown | None Visible | |

| WEAPON | Arrest Date mo/day/yr | Arrest Time | Arrest Location (include name of business) |
|---|---|---|---|
| ☒☒ Yes No ☐ | 06/13/86 | 6:49 ☐ A.M. ☒ P.M. | 58 Ct. S.W. 72 St. Roadside |

| CO-DEFENDANTS | Last | First | Middle | DOB mo/day/yr | ☒ In Custody ☒ Felony ☐ Juvenile |
|---|---|---|---|---|---|
| 1. Simms, Domingo Lazaro | | | | 08/04/65 | ☐ At Large ☐ Misdemeanor |
| | Last | First | Middle | DOB mo/day/yr | ☒ In Custody ☒ Felony ☐ Juvenile |
| 2. McGowan, Ricky Cooper | | | | 09/29/66 | ☐ At Large ☐ Misdemeanor |

| CHARGES | STATUTE | ☐ AC ☐ CAPIAS ☐ BW ☐ FW ☐ PW ☐ CIT • VIOLATION OF SECT |
|---|---|---|
| 1. Conspiracy To Committ Armed Robbery | 777.04 | BWL    21-81(a) |
| 2. | ------- | m 86-62197 |
| 3. C.C.F. Possession of a Firearm by a convicted Felon | 790.01 790.23 | OPEN FEL E85-24028A -E8624193 OF THE CODE OF Dade County |

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant

On the 13 day of June, 19 86, at 6:40 ☐ A.M. ☒ P.M. 9510 S. Dixie Hwy. Kendall Liquors
                                (Time)                     (Location, include name of business)

committed the following violation of law: Narrative, (Be specific) At the above date and time the manager of

Kendall Liquors phoned police after witness #1. told him that he observed

the above Defs casing his business. The witness advised that the 4, black

males, were inside a dark blue or gray, new, chevrolet. That one of the

black males was observed concealing a double barrel shotgun under his coat.

A BOLO advising the above information was read by the dispatcher.

Approx. one minute after the BOLO was read Det. Campbell observed the Defs.

in a dark blue Chevrolet, northbound on S. Dixie Hwy. The Defs. made a U-

turn at S.W. 88 St. and drove south on S. Dixie Hwy., as they approached

Kendall Liquors at 9510 S. Dixie Hwy., they observed a marked police vehicle

The Defs. who were driving in the righthand lane and had slowed down in the

area of the liquor store immediately changed lanes to the far left lane and

sped away, after observing the police vehicle. The Defs. were      PAGE 1 OF 2

| | |
|---|---|
| oid for Other Agency gency _____ Verified By _____ | ☒ HOLD FOR BOND HEARING ☐ DO NOT BOND OUT (Officer Must Appear at Bond Hearing). |

I Swear that the above Statement is correct id true to the best of my knowledge and belief.

Det. Campbell
ficer's Name (Print)

M.D.P.D.   0082   (5)
partment Name    Court ID Number

Sworn to and subscribed before ms, the undersigned authority this day of ___

Deputy of the Court or Notary Public

CARLOS CRIMINAL

I understand that should I wilfully fail to appear before the court as required by this notice to appear that I may be held in contempt of court and a warrant for my arrest shall be issued. Futhermore, I agree that notice concerning the time, date, and place of all court hearings should be sent to the above address. I agree that it is my responsibility to notify Clerk of the Court (Juveniles notify Family Division Juvenile Section) anytime that my address changes.

You need not appear in court, but must comply with the instructions on the reverse side hereof.

Signature of Defendant, Juvenile and Parent or Guardian

COURT COPY

l02-142 REV. 10/81

| IDC No. | | | Agency Code | Municipal P.D. Def. ID No. | | MDPD Records and I D No. | | Court Case No. |
|---|---|---|---|---|---|---|---|---|
| | | | 30 | | | | | |

| DEFENDANT'S NAME | Last | First | Middle | | | DOB mo.-day/yr | |
|---|---|---|---|---|---|---|---|
| Taylor | | Timothy | Lee | | | 08 / 16 / 66 | |

| ADDITIONAL CHARGES | STATUTE | AC CAPIAS BW FW PW CIT # | VIOLATION OF SECT. |
|---|---|---|---|
| 5. | | | 21-81(a) |
| 6. | | | |
| 7. | | | |
| 8. | | | OF THE CODE OF Dade County |

subsequenly stopped in South Miami.  As the Def's. door was opened, the Def.

who was sitting in the left rear seat was observed by Det. Hames attempting

to conceal an unknown object on the floorboard.  The object was recovered

by Det. Hames and found to be a loaded 38, Cal. handgun wrapped inside a

ski-mask.  The Def. and Co-defs. were placed under arrest and transported

to DCJ via Sta. #5.

CAREER CRIMINAL

Hold for Other Agency

Agency _____ Verified By _____

I Swear that the above Statement is correct
and true to the best of my knowledge and belief.

Det. Campbell
Officer's Name (Print)

Officer Signature

M.D.P.D.        0082
Department Name    Court ID Number
33 02 142A REV. 10/61

HOLD FOR BOND HEARING
DO NOT BOND OUT (Official)
Must Appear at Bond Hearing.

Sworn to and subscribed before me, the
undersigned authority on _____ , 19__

Deputy of the Court or Notary Public

COURT COPY

Signature of Defendant Juvenile and Parent or Guardian

...that I hold I willfully fail to appear be...
...as required by this notice to appear...
...that a contempt of court and a war...
...for this action that be issued. Furthermore, I...
...that notice concerning the time, date, and...
...of my court hearings should be sent to the...
...address I agree that it is my responsibility to...
notify Clerk of the Court (Juveniles notify Family
Division Juvenile Section) anytime that my address
changes.

I am not required to appear in court, but must comply with
the instructions on the reverse side hereof.